Commonwealth of Pennsylvania *v.* Queen Coal
Co., a Pennsylvania Corporation, Oliver
Painter, trading as Alverton Fuel
Company, and Wilmer McGiffin.

*Leonard A. Redlich,* with him *Robert Y. Cassol, Redlich, Cassol, Redlich & Morocco,* and *Fred Adams* and *Ira B. Coldren, Jr., Coldren & Adams,* for defendants.

*Morris J. Solomon,* Assistant Attorney General, with him *William M. Gross,* Assistant Attorney General, and *J. Shane Creamer,* Attorney General, for plaintiff.

OPINION BY JUDGE ROGERS, April 28, 1971.

The plaintiff in this case, the Commonwealth of Pennsylvania, having taken an appeal from our refusal to grant a preliminary injunction, we provide this opinion in compliance with Supreme Court Rule 63.

The complaint avers that the defendants in their capacities hereinafter set out have modified, altered, rebuilt, refurbished and completely reconstructed an air contamination source, to wit, beehive coke ovens, without obtaining a permit of the Department of Health (now the Department of Environmental Resources); have operated said modified, altered, rebuilt, refurbished and completely reconstructed ovens; and have in such operation permitted smoke darker than No. 2 of the Ringelmann Smoke Chart to be emitted into the outdoor atmosphere. The first count of the complaint alleges that this activity constitutes a violation of Department Regulation III, Section 1.3(1) and Section 8 of the Air Pollution Control Act, 1960, January 8, P. L. (1959) 2119, 35 P.S. 4001. The second count accuses the defendants of having violated Regulation IV, Section 1.3(1) and Section 8 of the Act; and the third count charges the defendant with committing a public

nuisance. The plaintiff seeks an order enjoining the operation of the ovens.

The Department's Regulation III is, in pertinent part, as follows:

"Section 1.1 Definitions.

. . .

"(2) 'Modification' Any alteration which will, or might reasonably be expected to increase the amount, or change the effect or the characteristics of the air contamination discharged.

. . .

"Section 1.3 Approval to Construct or Modify and Permit to Operate.

"(1) After the effective date of this regulation, no person shall construct an air contamination source or install an air cleaning device on an air contamination source constructed after the effective date of this regulation, or modify an existing air contamination source without first obtaining approval for such construction, installation or modification from the Department.

"(2) No person shall operate an air contamination source after the effective date of this regulation unless the Department shall have approved the plan for construction of such source and issued a permit for its operation."

Regulation IV is, in pertinent part, as follows:

"Section 1.3 Limits for Particulate Matter Emissions.

"In the absence of a determination by the Commission imposing more stringent or less stringent limits, as provided for in Section 1.4 of the regulation, a local air pollution problem shall be deemed to exist:

"(1) If any person causes, suffers, allows or permits smoke from any combustion unit, the shade or appearance of which is darker than No. 2 of the Ringelmann Smoke Chart, to be emitted into the outdoor atmosphere.

"Whenever a local air pollution problem is deemed to exist, the Department may, in accordance with the procedures provided in the Air Pollution Control Act, issue an order directing the person or persons charged with causing, suffering, allowing or permitting such air pollution problem to control, abate or prevent such air pollution problem."

Before reciting the facts as developed at the hearing, we briefly comment on the Air Pollution Control Act, *supra*. Section 8 thereof alluded to in the complaint,[1] makes it unlawful to fail to comply with a rule, regulation or order of the Department. Section 4, clause 4.1[2] authorizes the Department to issue orders, provides for an appeal to the Air Pollution Control Commission from such orders, pending which the orders are held in abeyance, and provides for a further appeal from such orders to the courts under the Administrative Agency Law.[3] Section 10(a) of the Air Pollution Control Act, as amended,[4] authorizes the Department to request the Attorney General to petition the court of common pleas in the county in which the defendant resides or has his place of business for an injunction to restrain all violations of the Act. The Air Pollution Control Act does not as does the so-called Clean Streams Act, 1937, June 22, P. L. 1987, 35 P.S. 691.1 declare the activities sought to be ended or controlled to be public nuisances.

By deed dated September 17, 1969, the defendant, Queen Coal Company, acquired a parcel of land in Mount Pleasant Township, Westmoreland County, containing 4.708 acres of land. Queen Coal Company

---

[1] 35 P.S. 4008.

[2] Added 1968, June 12, P. L.      , No. 92, Section 4, 35 P.S. 4004.

[3] Act of 1945, June 4, P. L. 1388, Section 1, 71 P.S. 1710.1.

[4] 35 P.S. 4010(a).

leased the land to defendant Oliver Painter, who, in turn, engaged the defendant Wilmer McGiffin, to produce coke in forty-six beehive coke ovens existing on the tract. Although these ovens had not been operated since the year 1953, they were usable by removing dirt and coke left from the previous operation, the cutting of trees growing on or near the ovens, the supply of missing bricks for the doors, and by the installation of a so-called tunnel ring in approximately fifteen of the ovens. The tunnel ring is constructed of fire-resistant brick at the top of the oven and circumscribes the aperture through which coal is dropped and from which smoke and gas is emitted during the burning process. The installation of tunnel rings is a maintenance item in the operation of beehive coke ovens and is done frequently on working ovens. Since this operation commenced in October 1969 rings have been replaced on some ovens as often as three or four times. The size of the aperture formed by the tunnel ring affects the efficiency of the oven. Coke is the residue of coal after the release of volatile matter and gases by burning.

The volatile matter consists of ammonia, tar, light oils and the gases are carbon monoxide, carbon dioxide, hydrogen sulfide, sulfur dioxide, hydrogen cyanide, nitrogen, oxygen and methane. For every ton of coal used, sixty to seventy percent remains as coke with the balance of thirty to forty percent literally going up in smoke through the aperture at the top of the oven. Much of the volatile matter and many of the gases contaminate the air and adversely affect living things. The approximately thirty-five ovens in operation at the property at the time of hearing use about 1600 tons of coal per month and produce 1200 tons of coke, the balance of 400 tons being lost in the emission of volatile matter, gases and particulate matter seen as smoke. Some of these emissions contaminate the air, others

such as water and carbon dioxide do not and the record is silent as to what part of the 400 ton per month loss is composed of contaminants.

After October 1969, when the first of these ovens were placed in operation, Mrs. Helen Fitch, a neighbor, complained of defendants' ovens to a Mr. Fait, described only as a person being in charge of air pollution in Westmoreland County. It was not until November 5, 1970 that the regional air pollution control engineer of the Department of Health (now the Department of Environmental Resources) southwestern region of Pennsylvania, learned of the Fitch complaint. An assistant air pollution control engineer of the Department wrote to Mr. McGiffin by letter dated November 12, 1970, informing him that excessive quantities of gaseous and particulate matter were being emitted from these ovens, that these emissions should be *controlled,* recommending that an engineer's services be engaged, and *requesting* that a plan be submitted showing how his operation would be controlled "within the limits set forth in Section 1.3 of the Air Pollution Control Commission's Regulation IV". By letter dated November 18, 1970, McGiffin advised the Department that he had "contacted" an engineer but that the Department's deadline for submission of a plan by November 30, 1970 could not be met and requested additional time to make such submission. The Department extended the time for submission by a letter not produced in evidence. On or about December 7, 1970, a Venkataraman Ramadass, the regional air pollution control engineer of the Department of Environmental Resources, wrote to McGiffin "regarding Regulation III." The plaintiff did not produce a copy of this letter and there is no evidence as to what it contained regarding Regulation III.

On December 1, 1970, Larry W. Wonders, a Department air pollution control engineer, took Ringelmann readings which revealed that the smoke issuing from four of the ovens was of a shade darker than Ringelmann No. 2. On December 15, 1970, and on a later date not specified, one Orval Wold, also an air pollution control engineer, made similar tests and ascertained that smoke emanating from some of the ovens was darker than Ringelmann No. 2. On March 16, 1971, Mr. Wold observed some of the ovens and without making tests concluded that they were emitting smoke darker in shade than Ringelmann No. 2. The results of these tests were reported to Mr. Wold's superiors.

Mrs. Helen Fitch, a neighbor and the only member of the public who testified, visited the premises once apparently soon after the ovens were put in operation. She observed four or five ovens being used and described the other ovens as being in "bad condition" and as "falling down and all caving in." This visit was made at dusk. The Chancellor admitted and considered two statements of other neighbors offered by the plaintiff as injunction affidavits in support of the application. A closer inspection reveals that neither is an affidavit because neither is sworn to by the maker and neither contains any indication that the notary public whose signature and seal appears thereon actually administered an oath. One of these statements, that of an Iva M. McCurdy, describes the ovens as having been badly in need of repair prior to their use by the defendants. In contrast, McGiffin, who was called by the plaintiffs as on cross-examination, testified that all of the ovens were fully operable, that none required rebuilding and, that, as previously stated herein, he was required only to install tunnel rings in some of the ovens. The plaintiff was bound by this testimony to the extent that it was not intrinsically incredible or re-

butted by other evidence. The very general descriptions of both Mrs. Fitch and Iva M. McCurdy did not in our view impeach McGiffin's testimony which we do not believe to be improbable.

First Count of Complaint:

The plaintiff requested that defendants' operation be enjoined preliminary to hearing on the merits because of an asserted violation of the Department's Regulation III. This required a showing that defendants either constructed an air contamination source, installed an air cleaning device or modified an existing air contamination source without the Department's approval. Clearly, the defendants did not construct an air contamination source or install an air cleaning device. Did they modify the ovens? The regulation defines a modification as "any alteration which will, or might reasonably be expected to, increase the amount, or change the effect or the characteristics of the air contaminants discharged." There is no evidence of any alteration of the ovens so as to increase the amount or change the characteristics of air contaminants. At most, the record could supply the basis for an inference that defendants repaired or even rebuilt some of the ovens; but a repair or a rebuilding is not an alteration increasing or changing air contamination. We were not persuaded that this charge could be established.

Second Count of Complaint:

The plaintiff requested that defendants' operation be enjoined preliminary to hearing on the merits because the ovens emit smoke darker than Ringelmann No. 2, in violation of the Department's Regulation IV. However, Regulation IV does not prohibit such emissions; it merely provides that such emissions create an air pollution problem and authorizes the Department, in its discretion, to issue an order directing the person causing the condition to control, abate or prevent the

problem. No such order was ever issued to these defendants.[5] The letter of November 12, 1970, sent to McGiffin, merely requests a plan for controlling the emissions and the time for compliance with this has been extended. The defendants are clearly not in violation of Regulation IV.

In addition to the foregoing reasons for refusing preliminary injunctive relief based upon the alleged violations of Department regulations, we have the serious and unresolved question of this court's jurisdiction. As noted, Section 10(a)[6] of the Act authorizes the Attorney General to seek injunctive relief in the county in which the defendant resides or does business. The defendants made objection to our jurisdiction on this ground at the hearing; and subsequent to the hearing, but before the appeal was taken to the Supreme Court, preliminary objections were filed, raising this question.

Third Count of Complaint:

The plaintiff seeks a preliminary injunction on the grounds that defendants' actions create a public nuisance. Its proof consists of the testimony of Mrs. Fitch and the written statements of two other neighbors. We do have jurisdiction of this count. *Commonwealth ex rel. Shumaker v. New York and Pennsylvania Company, Inc.*, 367 Pa. 40, 79 A. 2d 439 (1951); Appellate Court Jurisdiction Act of 1970, July 31, P. L. , No. 233, Section 401(a)(2), 17 P.S. 211.401(a)(2). However, a public nuisance is "an inconvenience or troublesome offense that annoys the whole community in general, and not merely some particular person, and produces no greater injury to one person than to another

---

[5] Counsel for the Commonwealth frankly admits that an order was not issued because the defendants might exercise their right to appeal to the Commission thus causing the order to be held in abeyance.

[6] 35 P.S. 4010(a).

. . . . The difference between a public and a private nuisance does not depend upon the nature of the thing done but upon the question whether it affects the general public or merely some private individual or individuals." *Phillips v. Donaldson*, 269 Pa. 244, 246, 112 A. 236, 238 (1920). The proofs adduced at this hearing fell short of establishing that this operation is a public nuisance. They establish that of the many persons shown to reside in the neighborhood, one has complained to the Air Pollution Control Commission and two others have stated their annoyance with defendants' ovens. It may be that on trial of the merits the general public may be shown to be affected, but a more substantial case than here made is required to justify a preliminary injunction.

Further, there is absent here a showing of urgency requiring immediate action before trial on the merits. Mrs. Fitch apparently complained in late 1969; the Department took up the matter in November 1970. After investigating, it *requested* the defendants to submit a plan to *control* the smoke. In December 1970, the Department ascertained that the ovens were emitting smoke darker than Ringelmann No. 2. It did not then and it had not down to the date of the hearing in this matter issued an order to abate as its Regulation IV contemplated. The Department's suggestion that the Chancellor conclude that there is an urgent necessity to close this business is altogether incompatible with its own conclusion that defendants' activities did not require its interdiction.

In summary, we refused the preliminary injunction because the plaintiff failed to prove the alleged violations of Department regulations; because jurisdiction of this court to restrain such violations, if they did exist, is questionable; because there was not a clear showing of a public nuisance as alleged; and because there

appeared to the Chancellor to be no urgency which required this court's intervention prior to a trial on the merits.