670

## Hazleton Redevelopment Authority v. Hudock et al.

Argued April 12, 1971, before President Judge Bow-MAN, and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER and ROGERS.

*Cletus M. Lyman,* with him *Thomas L. Kennedy,* for appellant.

*Philip F. Hudock,* with him *Robert P. Hudock,* for appellees.

OPINION BY PRESIDENT JUDGE BOWMAN, August 12, 1971:

A record unnecessarily complicated by charges and accusations that have characterized every stage of this case, and the lower court's imperspicuous opinion, will require a full recital of its history and the critical facts which have led us to conclude that the lower court erred and must be reversed.

The Redevelopment Authority of the City of Hazleton initiated plans for an urban renewal project covering approximately twenty city blocks in the early 1960's. The Hazleton City Council adopted a resolution on April 25, 1966 approving the plan which included some one hundred and seventy separately owned parcels of land. The resolution authorized the Redevelopment Authority to obtain financial assistance from the United States Department of Housing and Urban Development (HUD) and to acquire and redevelop the subject real estate.

The redevelopment plan, known as "Downtown South Urban Renewal Area, Project No. Pennsylvania

R-211", included a lot owned by Frank and Mary Hudock. Their lot contained (a) a two and one-half story four-unit apartment, (b) a two and one-half story double house, and (c) a one and one-half story seven car garage. Negotiations between the Authority and HUD for Federal funds to finance the acquisition and redevelopment of the area resulted in a grant of necessary funds by agreement dated March 22, 1967. The Authority then proceeded to negotiate with the Hudocks and other affected property owners to acquire their premises.

There is significant dispute as to the course of these negotiations between the Authority and the Hudocks which is not clarified by the discussion of the lower court. All that is certain from the record before us is that some negotiations did go on and that no written agreement as to a sale was reached. The lower court's opinion does state that a "final order" was made by the negotiator for the Authority to the Hudocks on February 3, 1968.

On February 14, 1968, according to the lower court's findings, ". . . the subject property was extensively damaged in a fire." The Hudocks "accepted" the "final offer" on February 16, 1968, two days after the premises were substantially destroyed. The lower court found, however, that there was no binding contract between the parties because ". . . the impossibility of performance arising from the destruction of the property ends all contractual obligations relating to the property. West v. Peoples First Nat'l. Bk. & Trust Co., 378 Pa. 275; 106 A. 2d 427."

The Hudocks therefore claim the proceeds of a fire insurance policy on the property but argue that they are further entitled to the full pre-fire value of the land and structures from the Authority under a theory of constructive "taking" prior to the time of the fire. The Authority actually filed a declaration of "taking" on

October 4, 1968 and a Board of View was appointed.[1]

After a series of five hearings before the Board, it filed a report on October 10, 1969. The report concluded on the basis of all the evidence that there was no "taking"—actual or constructive—until the filing of the declaration on October 4, 1968.

The condemnees filed an appeal from this report in the Court of Common Pleas of Luzerne County on November 17, 1969. By decision filed April 3, 1970, the lower court reversed the Board and concluded: "The take in this case was one take, a complete take, and it occurred at one time. The time makes no difference as far as payment for the property is concerned. The Condemnees are entitled to be paid once." The lower court in effect determined that a *de facto* "taking" occurred sometime before October 4, 1968 and even *before* the fire on February 14, 1968 without specify- ing precisely when such a constructive "taking" did occur. The lower court did not discuss the evidence which led it to the conclusion reached, nor did it find that the Board's conclusion was contrary to the evidence before it on this issue.

---

[1] On May 1, 1968, the Hudocks as owners filed a Petition for Appointment of Viewers based on their theory of constructive "taking" under Section 502(e) of the Eminent Domain Code of June 22, 1964, P. L. 84, as amended, 26 P.S. §1-502(e). This petition was restricted to the four-unit apartment building destroyed by fire. The Authority filed a rule to show cause why the petition and the viewers should not be dismissed on June 25, 1968. While both the petition and the rule were still pending, the owners filed another Petition for Appointment of Viewers as to their remaining property on August 13, 1968 and obtained an order of appointment. The Redevelopment Authority filed preliminary objections. After in- formal proceedings in the lower court, the condemnors agreed to file the declaration of "taking" on October 4, 1968, reserving all substantive defenses, and the three actions were consolidated by stipulation of both parties on March 24, 1969. One Board of View was to handle all three actions.

The circumstances of a fire destroying one of the units on the Hudock property (the two and one-half story four-unit apartment) before the filing of a declaration of "taking" by the Authority has unfortunately and unnecessarily clouded the narrow issue of whether the actions and activities of the Authority prior to its filing of a declaration constituted a constructive "taking", and, if so, at what point in time did it occur.

The Hudocks do not object to the viewers' award as to their property as it presently exists and specifically accept the award except insofar as it does not place a value on the burned out structure.[2]

We cannot agree with the lower court that a constructive condemnation of any part of the Hudocks' property occurred before the fire. The Board concluded that the entire property interest was taken by a formal declaration of "taking" on October 4, 1968. The Board report states: "We are of the opinion that constructive condemnation is not applicable to the instant case since condemnees exercised full control and enjoyed all the benefits accruing from ownership until October 4, 1968, when condemnation was legally effected."

The Board of View correctly concluded on the basis of the evidence before it that the preliminary actions by the Redevelopment Authority in designating the subject premises as part of a renewal area and undertaking negotiations to acquire the property and others do not constitute substantial interference with the owner's use and enjoyment of his land amounting to a legally effective "taking".

The developing expansion of the theory of constructive "taking"—sometimes referred to as inverse con-

---

[2] In their appeal petition the Hudocks ". . . *do not* appeal from the Award of Viewers of $35,000 . . . for Lot No. 5, Square No. 54 . . . and the improvement of a double house at 9-11 West Walnut Street and a garage at 13-15 West Walnut Street. . . ."

demnation and more recently in the case law as a *de facto* "taking"—has been responsive to the reality that activities carried on incident to massive, complex and time consuming programs launched by government to solve some of the acute problems that beset our society *may* so substantially interfere with one's use and enjoyment of his property as to constitute a compensable injury in a constitutional sense or as being within applicable statutory law, even though the power of eminent domain has not been formally exercised against the property in question and there has been no physical intrusion of it.

In a decision of this Court[3] involving the "Crosstown Expressway" project in Philadelphia, we have reviewed the developing case law in Pennsylvania on this subject and concluded on the issue of the sufficiency of a pleading in stating a cause of action: "We are concerned, however, with allegations which, if proven, suggest a course of action or conduct on the part of a government, clothed with the power of eminent domain, which may have deprived a property owner of real and material rights in and enjoyment of property ownership. If such be the case we believe the property in question has been injured within the meaning of the Eminent Domain Code. Therefore, we shall affirm the lower court order in dismissing the Commonwealth's preliminary objections. We believe that at least some of the allegations of the petition are sufficient to potentially establish compensable injury."

In the instant case the record discloses it was not until after the fire which destroyed the most valuable

---

[3] In the matter of: Condemnation in fact, by the Commonwealth of Pennsylvania, Department of Highways, arising from the failures and refusals to act by the said Department of Highways concerning and with regard to the Crosstown Expressway in Eminent Domain, 2 Pa. Commonwealth Ct. 3, No. 999 Transfer Docket 1970, opinion dated August 12, 1971.

structure on the Hudock property and the refusal of the Authority to negotiate the purchase of the property at some pre-fire value that a *de facto* condemnation theory was advanced by the Hudocks.

In their original petition for the appointment of viewers pursuant to Section 502(e) of the Eminent Domain Code, *supra,* (footnote 1), the Hudocks allege compensable injury by reason of the approval of the "Downtown South Urban Renewal Area Project", the issuance of notices by the Authority to property owners that the Authority will purchase, and negotiations thereafter carried on between the Authority and the Hudocks (and other property owners). These acts and activities, it is asserted, have caused petitioners to be "locked into" their property and effectively denied them a market for their property. A further allegation that uncertainty as to when, if ever, the Authority would formally exercise its power of eminent domain was mooted by the Authority doing so several months later.

The approval and funding of an urban renewal or redevelopment project by governmental authority followed by notices to and negotiations with affected property owners, and acquisition by agreement of some parcels, are not in themselves sufficient to establish a substantial interference with one's use and enjoyment of his property as to amount to a *de facto* "taking" or compensable injury within the meaning of the Eminent Domain Code.

Apart from extensive valuation testimony, much of the record made before the Board was proof of the above mentioned actions and activities by the Authority and other governmental bodies. Such actions and activities did not in themselves deny to petitioners a market for their property. While it is generally recognized that such actions and activities have an effect upon the fair market value of real estate, provision is

made for such impact by Section 604 of the Eminent Domain Code, *supra,* (footnote 1) 26 P.S. §1-604.

Although the record also discloses some testimony on behalf of the Hudocks that the foregoing action and activity by the Authority depressed rental values of the Hudock property, it was vague and generalized and apparently found by the Board not to be credible or sufficient to sustain a compensable injury in one's use and enjoyment of property for rental purposes. Our independent review of the record produces the same conclusion.

The order of the lower court is reversed and the award of the Board of View reinstated. Each party to pay his own costs.

Judge MANDERINO dissents.