In Re: Petition of 1301 Filbert Limited Partnership for the Appointment of Viewers Etc. 1301 Filbert Limited Partnership, Appellant.

Argued March 5, 1981, before President Judge CRUMLISH and Judges BLATT and WILLIAMS, JR., sitting as a panel of three.

*Louis B. Kupperman*, with him *Jeffrey A. Less*, of counsel: *Dilworth, Paxson, Kalish & Levy*, for appellant.

*Marjorie H. Stern,* Chief Assistant City Solicitor, with her *Alan J. Davis,* City Solicitor, for appellee, City of Philadelphia.

OPINION BY JUDGE WILLIAMS, JR., February 22, 1982:

In this case, an eminent domain appeal, the 1301 Filbert Limited Partnership (Partnership) seeks' reversal of a lower court order that dismissed its petition for a board of viewers to assess condemnation damages. The issue facing us, as it did the court below, is whether the actions of the City of Philadelphia (City), relative to a certain public project, destroyed the commercial viability of a hotel owned by the Partnership and thereby worked a de facto taking of the property. The lower court's dismissal of the Partnership's petition was on a determination that no such de facto taking had occurred; and, it is that determination which is here contested.

In February 1978, the Partnership filed in the Court of Common Pleas of Philadelphia County a petition for the appointment of viewers to assess condemnation damages against the City. The petition alleged, in essence, that the City's activities and publicity regarding a "Center City Commuter Tunnel Project" (Tunnel) resulted in a de facto taking of an eleven story building called the Essex Hotel (Essex), which is owned by the Partnership subject to a mortgage, and which abuts the route officially designated for construction of the Tunnel. Underlying this assertion of a taking is a further allegation: that the City's actions rendered the Essex useless as a hotel for such a significant period of time that the Partnership lost needed financing, and is now faced with total loss of the hotel through mortgage foreclosure.

The Partnership's petition, filed pursuant to Section 502(e) of the Eminent Domain Code,[1] was based on a theory that the City's Tunnel activities deprived the Partnership of the beneficial use of the Essex, and thereby inflicted a compensable injury, without a formal declaration of taking having been filed.

In March 1978, the lower court overruled the City's preliminary objections to the petition; thereafter, the court conducted an evidentiary hearing to determine if the City had committed a de facto taking as alleged. During June 1979 and July 1979, the court heard evidence from fact and expert witnesses for both parties. Finally, by an order dated January 9, 1980, the court made its ruling that the City had not committed a de facto taking of the hotel; and, thus, the court dismissed the Partnership's petition for viewers. When that order was entered of record the instant appeal followed.

For us to decide whether or not there has been a de facto taking of the Essex Hotel, it is obvious that we must consider the nature of the Tunnel project itself and the nature of the City's activities relative to the project. So too, we must consider the nature of the hotel property and the nature of the Partnership's operative interest in it. As a further matter, we must consider the nature of the impact which the Tunnel project and the City's activities had on the Partnership's use of, and interest in, the hotel. One of the things giving this case a special posture is the fact that at no time material to the proceedings was the Essex Hotel open to guests or available for other commercial use.

---

[1] Act of June 22, 1964, Special Sess., P.L. 84, *as amended*, 26 P.S. §1-502(e).

## The Tunnel Project

In center-city Philadelphia there are two commuter railroad stations or terminals, Suburban Station and Reading Terminal. Suburban Station, located at 16th Street and John F. Kennedy Boulevard, chiefly serves passengers commuting to and from suburbs to the west and southwest of the city. About five blocks east of Suburban Station is Reading Terminal, which is located at 12th and Market Streets. Reading Terminal chiefly serves commuters to and from points in the north of the city and the suburbs beyond.

To further describe the locational relationship between these two rail stations, it is significant to add that a few blocks to the east of Suburban Station, its front street, John F. Kennedy Boulevard, becomes Filbert Street, which continues in a straight course eastward and, in the distance of a few more blocks, passes directly under part of the rear of Reading Terminal. Putting it differently, John F. Kennedy Boulevard and Filbert Street together constitute a single, straight thoroughfare, which at one point passes adjacent to Suburban Station, and at another point about five blocks away passes adjacent to Reading Terminal.

Since early in this century various business, governmental and civic groups have envisioned the linking of Philadelphia's center-city railroad stations by means of a Tunnel. Yet, until the 1960's such a project remained little more than a concept. In that decade, however, the government of the City of Philadelphia began efforts to convert the concept into reality.

In 1960, the City engaged an engineering firm to prepare a study addressing the feasibility of a Tunnel connecting Suburban Station and Reading Terminal by way of Kennedy Boulevard and Filbert Street. That same year, City planners published a land-use docu-

ment that made specific reference to a Tunnel under Filbert Street. In 1961 the City included the Tunnel project in its "Capital Program," and in 1963 appropriated money for the project for the first time. In the middle 1960's the City had private engineers prepare preliminary designs for the Tunnel. Those designs showed that the Tunnel would include several blocks of Filbert Street, with certain building along Filbert Street being underpinned during construction of the Tunnel. During most of the 1960's, it was hoped that the City, and the railroads involved, would finance the Tunnel's construction.

In 1968, after the creation of the Federal Urban Mass Transportation Administration, the City applied for federal funding to further the project. Pursuant to that application the federal government, in 1972, awarded the City a "technical study grant" of several million dollars; the purpose of the grant was to enable the City to update its preliminary designs for the Tunnel, and to prepare cost analyses and an impact statement. In the wake of that grant a City engineer was made project manager for the Tunnel; and contracts were entered into with private engineers for project scheduling and coordination.

In 1974, the City published its "Capital Program" for the years 1974-1979, and that publication continued the specific references to the Tunnel. The publication stated that as of 1973 the City had spent over $7,000,000 for Tunnel purposes, and that an expenditure of about $198,000,000 was estimated for the six-year period 1974-1979. It was also estimated that Tunnel expenditures for the year 1973 alone would exceed $43,000,000. The City further announced in 1974 that it intended to move forward with the Tunnel if the federal government would fund a major portion of the entire project.

In July of 1975, the federal authorities granted the City $25,000,000 in capital assistance, to fund such project items as land acquisition and construction and engineering plans. Then, by a City ordinance passed in December 1975, the City's Department of Public Property was *authorized* to spend up to $20,000,000 to purchase, lease, condemn or otherwise acquire specific properties, to the extent those properties were needed for the Tunnel project. Included on that list of properties was the Essex Hotel, which is located at 13th and Filbert Streets abutting the path of proposed Tunnel construction. We note, in this context, that the mentioned ordinance *authorized* the acquisition of the listed properties but did not purport to *mandate* it.

After appraising the value of the Essex, the City compared the costs of underpinning the structure and the cost of acquiring it. The conclusion was reached that underpinning would be cheaper; consequently, the Essex was excluded from the group of properties the City actually intended to acquire pursuant to the Tunnel project.

In January 1977, the federal government and the Mayor of Philadelphia signed a construction funding contract, whereby the federal government would provide the City with over $240,000,000 of a total of about $300,000,000 needed to construct, and put into operation, the Tunnel connecting Suburban Station and Reading Terminal. In April 1977, the Philadelphia City Council approved the construction funding contract. After the grant of construction funding, opponents of the Tunnel instituted a suit in the federal district court to block the project; however, that effort failed with the dismissal of the action in September 1977.

## THE PARTNERSHIP AND THE ESSEX HOTEL

In the midst of the City's efforts regarding the Tunnel, the Partnership purchased the Essex Hotel. In June 1974 the Partnership, by means of straw parties, entered into an agreement for the purchase of the hotel at a price of $600,000. Settlement for the purchase occurred on February 28, 1975, on which occasion the Partnership paid $150,000 in cash, and executed a purchase money mortgage to the seller for the $450,000 balance. The purchase money mortgage was to become due in three years, on February 28, 1978.

At the time the Partnership purchased the hotel no federal money had been appropriated for construction of the Tunnel, or even for land acquisition in connection with the Tunnel project.

The Essex is an eleven story, steel and masonry structure built in 1917; and contains 225 guest rooms. On the hotel's ground floor are a lobby, a restaurant, and several retail stores; on the second floor are function rooms; and, the remaining nine floors contain the guest rooms. Other main features are a two level basement housing various facilities; and a parking lot is at the rear of the hotel property. The only public entrances to the Essex face on Filbert Street.

At the time of the Partnership's purchase, the Essex had been closed for several years and was in a state of serious disrepair. The Partnership's purpose in buying the hotel was to renovate it and convert it to a low or moderate price, European style hotel, hopefully in time for the Bicentennial celebration in 1976. According to detailed projections done for the Partnership, a renovated Essex would be a profitable hotel operation.

The Partnership commenced renovations soon after making settlement in February 1975. Indeed, contractors and workmen had been engaged even prior to settlement. The original estimate was that the renova-

tions would cost about $523,000; and the partners expected to finance that cost by their own contributions and by loans from financial institutions. The partners also expected to obtain long-term financing to satisfy the purchase money mortgage before its due date in February 1978. However, in March 1975, after renovations were underway, one of the partners heard a news report which he interpreted to mean that the federal government had granted the City funds to construct the Tunnel. In truth, however, federal construction funding had *not* been granted as of that time.

In response to the news report, the Partnership met with the City's Commissioner of Public Property, about March 20, 1975, to discuss the Tunnel and the Essex. In that meeting the Partnership proposed selling the hotel to the City; but that proposal was rejected. The Commissioner informed the Partnership that construction funding had not been approved as of then and that, in any event, the City did not intend to acquire the Essex, *either by purchase or condemnation.* The Commissioner also stated that the Essex was *not on the route of the Tunnel,* and that Tunnel construction would not damage the hotel or interfere with renovation work. Following the meeting of March 20, the Partnership decided to continue with the hotel renovations.

Soon after it received the federal capital assistance grant in July 1975, the City sent a letter to the Partnership advising that the City was going to appraise the Essex to ascertain its fair market value, for purposes of *possible* condemnation in connection with the Tunnel. As a result of that letter the Partnership had a second meeting with the Commissioner of Public Property; and, again, the Partnership was told that because the Essex was not in the right-of-way for the Tunnel the City would *not* purchase or condemn the hotel.

During 1975 the Partnership experienced delays, union problems and work stoppages in connection with the renovation efforts. Moreover, it was becoming apparent that the renovations required were more extensive than initially conceived and that the costs would greatly exceed the original estimates. By December 1975 the Partnership had spent over $500,000 on renovations; and yet, substantial work remained. December of 1975 also brought a visit to the hotel by two City-retained engineers: their purpose was to prepare plans for the underpinning of the building. This visit prompted a third meeting of the Partnership and the Commissioner, who once again stated that the City was not interested in acquiring the hotel. A few days after this meeting, however, the City enacted the ordinance which *authorized* the acquisition or condemnation of certain Tunnel-related properties; and that list of properties did include the Essex.

The following year, 1976, brought continued but further-troubled renovation activity by the Partnership. Deficiencies in work coordination became apparent; and delinquencies in the payment of contractors caused work stoppages. By June 1976 the Partnership had accumulated unpaid bills totalling more than $350,000; and of that amount over $230,000 was owed to contractors. It became clear that the hotel would not be open in time for the 1976 Bicentennial as the partners had initially planned.

The partners also realized in 1976 that outside financing was needed. Consequently, in August 1976 the Partnership engaged William Batoff, a mortgage correspondent for the Sun Life Insurance Company of America (Sun Life), to arrange permanent financing and a construction loan for the Essex. Batoff, upon analyzing the hotel enterprise, concluded that it was commercially viable; accordingly, he recommended to Sun Life that the permanent financing be undertaken.

In March 1977, Sun Life issued a letter of commitment to loan the Partnership $1,250,000 for a term of twenty-five years, conditioned upon the completion of the hotel's first seven floors by November 1, 1977. However, to complete those floors the Partnership had to obtain a short-term construction loan to pay for the remaining work.

Armed with the commitment letter from Sun Life, Batoff applied to the Continental Bank (Continental) to arrange an interim construction loan of $1,200,000; the proceeds of which were intended for completing the seven floors required by Sun Life, paying outstanding contractor claims, and retiring the purchase money mortgage on the hotel. It was further contemplated that the Continental loan would be "taken out," or paid off, by the permanent loan from Sun Life.

A few months prior to the Sun Life commitment letter, there occurred another event which was to have special significance: in January 1977 the federal government approved construction funding for the railroad Tunnel. On January 12, 1977, the requisite contract was signed by the Federal Secretary of Transportation and the Mayor of Philadelphia.

The Sun Life financing commitment remained in force even after the Philadelphia City Council, in April 1977, voted approval of the Tunnel construction funding contract. Sun Life did, however, in July 1977, issue an amended commitment letter, providing as follows: to loan the Partnership $1,000,000 (instead of $1,250,000) if the first seven floors of the hotel were completed by October 19, 1977 (instead of November 1). The amendment also increased the amount of financing to $1,450,000 if the remaining four floors were to be completed as hotel rooms; or to $1,650,000 if those remaining four floors were to be made into apartment units. These amendments in the Sun Life commitment were made while the application for the construction loan from Continental was still pending.

In September 1977, the federal district court dismissed the lawsuit which has been brought to enjoin the construction of the Tunnel. According to Batoff's testimony, the Tunnel at that point seemed to him a reality.

October 1977 came without any formal action by Continental concerning the construction loan for the Essex; as a result, the Partnership urged Batoff to seek an extension of Sun Life's commitment, beyond the October 19 deadline. By that October, however, Batoff's appraisal of the hotel enterprise was undergoing change, due to the dismissal of the lawsuit and due to more detailed information concerning the nature and extent of expected Tunnel construction activity, *especially that which would take place in front of the Essex.* Batoff had formed the opinion that a hotel operation, such as was planned for the Essex, could not tolerate the construction activity the Tunnel would entail.

In November 1977, Continental issued a formal rejection of the Partnership's construction loan application, *stating that the Tunnel was the reason.* The bank's position was that the expected construction work on the Tunnel would interrupt the operation of the Essex as a hotel, and that, therefore, the Essex could not be successful. Following the rejection by Continental, Sun Life refused to extend its commitment, *also giving as its reason the expected work on the Tunnel.* Sun Life's final action was taken on the recommendation of Batoff, who concluded also that further efforts to secure financing for the Essex would be futile, because of the Tunnel project.

Having failed to obtain outside financing, and with the maturity date of the purchase money mortgage approaching, the Partnership once more turned to the City, for the fourth and last time, in January 1978. Once more the Partnership urged the City to buy the

Essex, and argued that the City had an obligation to do so because of the impact of the Tunnel. Once more the City took the position that it would not purchase or condemn the hotel, even though authorized by ordinance to do either. On February 15, 1978, the Partnership filed its petition for a board of viewers, alleging a de facto taking of the Essex.

Being without the permanent and construction loans it sought, the Partnership defaulted on its mortgage when it came due on February 28, 1978. Shortly thereafter, the mortgagee obtained a judgment in mortgage foreclosure; and, a sheriff's sale of the Essex was scheduled for May 1978. However, the sheriff's sale was judicially stayed pending the final outcome of the instant litigation.

### Tunnel Construction Activity

Tunnel construction began in June 1978, about five months after the Partnership's last meeting with the City. However, as of the time this case was tried in the lower court, little, if any, construction activity had begun in the 1300 block of Filbert Street, where the Essex is situated. However, the City conceded that construction would soon reach that point; and, witnesses for both parties testified to the nature, extent, and impact of the prospective work.

Tunnel construction activity in the 1300 block on Filbert Street, in front of the Essex, would be performed in several stages and would take at least four years. In that block the full extent of Filbert Street's cartway, which has a width of approximately thirty-eight feet, would be turned into a pit forty feet deep. In short, the Essex would be fronting on a pit about thirty-eight feet wide and forty feet in depth. The excavation of this pit would, at least at first, expose all the utility lines and pipes under the street in front of the hotel.

The construction work would entail the use of heavy equipment such as pavement breakers, pile drivers, compressors, cranes, bulldozers, and dump and supply trucks. In addition, on a corner across a street from the Essex the existing buildings would be demolished, and that site converted to a work area and a storage area for construction equipment.

The entire length of the pit in the 1300 block of Filbert Street would be covered with a deck; and, at each end of the block a temporary pedestrian bridge would provide a means of crossing from one side of the street to the other. The decking and the bridges would hang directly over the pit for about four years. One of these pedestrian bridges would be placed as to directly serve the Essex's entrances on the north side of Filbert Street; that is, by spanning the pit at a point which would directly link the entrances with a sidewalk on the south side of Filbert Street. A sidewalk that served the north side of the 1300 block, and abutted the front of the Essex, was to be at least partially removed. Although there would remain one or two other approaches to the hotel building, that did not require crossing the construction activity or construction site, it was clear that the front entrances of the Essex would be, for all practical purposes, faced by the Tunnel work.

As was also revealed at trial, the 1300 block of Filbert Street would be closed to regular vehicular traffic during all stages of construction in that block, meaning a period of about four years. However, there would be provided a fifteen foot-wide emergency lane with movable barriers at each end of the block; this lane could be used for local deliveries, as well.

Regarding the noise and dust that would be caused by the Tunnel construction activity, it was represented that the excavators, constructors, and other workmen would observe government pollution restrictions, and

that an accoustical consultant would be made available.

At trial the Partnership presented Sigfried Richter as an expert witness concerning the hotel. Richter was the general manager of a Hilton Hotel in Philadelphia and the president of the Philadelphia Hotel and Motel Association; he also was a member of the boards of directors of the Pennsylvania Hotel Association and the Philadelphia Convention Bureau. This witness described his twenty-five years of experience in the hotel business, stated that he had intimate knowledge of that business in Philadelphia, and indicated his personal familiarity with the location of the Essex as well as other hotels in the city.

Richter further testified that there was a need in center city Philadelphia for a hotel such as the Essex; and, he was of the opinion that the Partnership's profit projections were sound and that the Essex would have been a successful enterprise but for the Tunnel project. It was Richter's opinion that with the onset of Tunnel excavation and construction in front of the hotel, with the concomitant noise and dust, the hotel could not stay in business for three months even if it had been an ongoing operation. According to this witness, the construction activity would be incompatible with the chief offerings of a hotel, which are "time" and "peace and quiet."

The City offered no evidence to rebut the testimony of Sigfried Richter. And, as already discussed, the lending institutions from which the Partnership sought financing had earlier reached the conclusion that the prospective hotel operation could not withstand the prospective construction activity for the Tunnel, and denied financing for that reason.

Section 502(e) permits a condemnee to petition for the appointment of viewers if there has been a compensable injury suffered and no declaration of taking therefor has been filed. Such compensable circumstances have been judicially characterized as a "de facto taking." *Greger v. Canton Township*, 41 Pa. Commonwealth Ct. 20, 399 A.2d 138 (1979).

It is now established in our law that a de facto taking occurs when an entity clothed with the power of eminent domain substantially deprives an owner of the use and enjoyment of his property. *Conroy-Prugh Glass Co. v. Commonwealth*, 456 Pa. 384, 321 A.2d 598 (1974); *Griggs v. Allegheny County*, 402 Pa. 411, 168 A.2d 123 (1961), *rev'd on other grounds*, 369 U.S. 84 (1962); *Miller Appeal*, 55 Pa. Commonwealth Ct. 612, 423 A.2d 1354 (1980). It is also the law that in order for a property owner to establish a de facto taking, he must show there are exceptional circumstances which substantially deprive him of the use of his property. *Id.* Furthermore, the property owner must show that his deprivation is the direct and necessary consequence of the actions of the entity having the power of eminent domain. *Lizza v. Uniontown City*, 345 Pa. 363, 28 A.2d 916 (1942); *Greger, supra. Accord, Harborcreek Township v. Ring*, 48 Pa. Commonwealth Ct. 542, 410 A.2d 917 (1980).

The theory of de facto taking has been developed in response to the reality that activities carried on incident to massive, complex and time-consuming programs launched by government may so substantially interfere with one's use and enjoyment of his property as to inflict a compensable injury in a constitutional sense or as being within applicable statutory law, even though the power of eminent domain has not been formally exercised against the property in question and

there has been no physical intrusion of it. *Hazleton Redevelopment Authority v. Hudock*, 2 Pa. Commonwealth Ct. 670, 281 A.2d 914 (1971). The substance of this principle was reiterated in *Commonwealth's Crosstown Expressway Appeal*, 3 Pa. Commonwealth Ct. 1, 281 A.2d 909 (1971). There, this Court stated:

> Under exceptional circumstances it has been held in Pennsylvania and elsewhere that governmental action demonstrating an intention to effect a · public improvement and acting thereon in a manner demonstrating commitment to completion of the improvement amounts to a taking in a constitutional sense even though there has been no physical taking of the property alleged to have been injured.

*Id.* at 5, 281 A.2d at 911.

The above principle from the *Hazelton* and *Crosstown Expressway* cases can be said to have its roots in the decision of our state Supreme Court in *Philadelphia Parkway*, 250 Pa. 257, 95 A. 429 (1915). In *Parkway* the involved property owner was held to have suffered a taking of his property, even though there had been no formal condemnation or physical intrusion at the time he petitioned for viewers. The property was within the lines of a parkway or boulevard that the City of Philadelphia had proposed and placed on the city plan several years prior to the owner's petition. Despite that lapse of time, `no ordinance had been passed formally "opening" the parkway. During that period the City had, however, demonstrated its commitment to the project: The route and dimensions of the parkway were fixed and laid out on the, ground. Some properties on the path of the project or adjacent thereto were condemned; others were acquired by purchase; and, some buildings were demolished. Indeed, work had been done˙on sections of thé parkway. In short, prior to the owner's petition

for viewers many of the necessary steps looking to the completion of the improvement had been taken, despite the lack of an "opening" ordinance.

In the *Parkway* case the City's activities relative to the project had an adverse economic effect on the litigant's property, and had the same effect on other uncondemned or unpurchased properties on the path of the improvement. Regarding the impact of those activities, the Supreme Court said:

> Now a word as to the situation of abutting owners whose properties are affected by the proposed improvement. The municipal arm of the city has lain upon all properties within the lines of the parkway, with such restrictions and limitations as are implied thereby.... New buildings cannot be erected, nor can valuable improvements be made without risk of loss. Rental values have been depreciated and general market values seriously affected.

*Id.* at 265, 95 A. at 431-432. The Supreme Court concluded that the City's activities relative to the parkway were equivalent to notifying the property owners that their realty would be appropriated for parkway purposes, and that their possession was about to be disturbed. From that determination the Court further reasoned, and held, as follows: Since the City's activities demonstrated its commitment to the parkway project and had, thereby, caused the injuries described, those activities resulted in a taking of property in a constitutional sense.

Of course the *Parkway* case preceded the Eminent Domain Code. Yet, to whatever extent Section 604 of the Code[2] would now remedy the injuries suffered in

---

[2] 26 P.S. §1-604. By mandate of this Section, any precondemnation change in a property's fair market value due to a generally known imminence of condemnation, other than a change in value caused by physical deterioration within the control of the condemnee, shall be disregarded in determining fair market value.

that case, the *Parkway* perception of compensable injury has not lost its applicability.

Although the Pennsylvania Supreme Court in its *Griggs* opinion stated what has become the broad, general definition of a de facto taking, there is no litmus formula to determine when government action will be deemed to have the effect of such a taking. Thus, it has remained for the courts to provide, with case-by-case development, the needed doctrinal elaboration. With that in mind, we first shall consider cases in which it was held that there was no de facto taking; then, we shall consider cases in which it was held that such a taking had occurred.

One of the first significant cases directly addressing a claim of taking under Section 502(e) of the Code was *Commonwealth Appeal*, 422 Pa. 72, 221 A.2d 289 (1966). That case arose from the recording, by governmental authorities, of state-approved plans designating the location and width of a proposed public highway. The property owners in the case received, from the state, written advice of the recording and of how the plans would affect their property. The notice also indicated that their property would be condemned at some unspecified future time pursuant to the highway project. Moreover, the notice from the state instructed the owners that they would bear the risk of noncompensation for any improvements made to affected land after the recording of the highway plans.

In *Commonwealth Appeal* the Supreme Court rejected the owners' claim that the recording of the highway plans had effected a taking of their property. Of decisive significance to the Court was the fact that neither the recording of the plans, nor any other governmental action, had deprived the owners of the use or enjoyment of their property. The Court observed that they could have continued to treat the property in any manner they pleased, even to the ex-

tent of making improvements thereon. In that regard, the Court declared that the state could not constitutionally excuse itself from liability for improvements made by owners prior to formal condemnation, and that any such improvements would be a compensable element at the time of formal taking.

In the *Hazleton Redevelopment Authority* case, *supra*, we articulated our recognition that even in the absence of a formal condemnation or physical intrusion, governmental activities pursuant to a public project can constitute a de facto taking of property. However, on the facts of *Hazleton* we concluded that no such taking had occurred. In that case the litigant owners had property in an area planned for urban renewal. The property was one of the parcels designated for governmental acquisition; and was, in fact, subsequently condemned. The owners made a claim of de facto taking, based on the governmental pre-condemnation activities of approving and funding the renewal project, notifying affected property owners, and negotiating with them for the acquisition of their parcels. The litigant owners asserted that these activities "locked" them into their property and denied them a market for it.

In *Hazleton* we rejected the claim of de facto taking, for the reason that the official activities complained of did not, in themselves, substantially interfere with the litigant owners' use and enjoyment of their property. The evidence in the case established that, as to the property in question, the owners exercised full control and enjoyed all the benefits accruing from ownership, without governmental diminution, until the time formal condemnation was effected. Any loss of market value, we observed, would be redressed under Section 604 of the Code.

Relying on the decision in *Commonwealth Appeal*, this Court in *County of Allegheny v. Church of Jesus*

*Christ*, 14 Pa. Commonwealth Ct. 510, 322 A.2d 803 (1974), held that municipal pre-condemnation activities which did not affect the income of the subject property but only the feasibility of continuing a construction project on it, did not cause a de facto taking of the property. The appellee owned land upon which it had planned to erect a church. After the land had been graded and the excavation for the foundation about 75% completed, the appellee-owner learned that county authorities planned to expand the municipal airport and that those plans contemplated the acquisition of the appellee's land. Indeed, the owner was "advised" by a county aviation official to cease construction of the church.

After the airport expansion program was publicized and approved, county officials commenced negotiations to acquire the appellee's property; when those negotiations failed, a declaration of taking was filed condemning the property. The appellee filed preliminary objections to the declaration, alleging that a precedent de facto taking had occurred.

In the *Church of Jesus Christ* case, the owner's assertion of a de facto taking was based only in part on the government's activities of publicizing the expansion plan, approving it, and notifying affected owners of the impending condemnation. The appellee further stressed that it had been "advised" not to continue its construction project on its property. In rejecting the appellee's position, we emphasized that none of the official actions averred, or the resultant publicity, had affected any income realization from the property. We also concluded that, notwithstanding the "advice" to cease construction, the appellee had retained the legal right to make pre-condemnation improvements to its property, even though it was unfeasible to do so. That is, had the appellee continued with its building project to the date of formal condemnation, the appellee

would have been entitled to compensation for that improvement.

Another case involving a claim of de facto taking because of a proposed highway is *Department of Transportation v. Securda & Co.*, 16 Pa. Commonwealth Ct. 40, 329 A.2d 296 (1974). There, we held that the owner's petition for viewers did not state a cause of action for a de facto taking, and that preliminary objections to the petition should have been sustained.

In *Securda* the Commonwealth had filed plans demarcating the right-of-way lines for a proposed legislative route. Pursuant to the plan, the Commonwealth had either purchased or condemned all properties that were totally within the right-of-way lines. However, as to properties that were only partially within the lines, acquisitions were postponed pending the Governor's approval of final design plans. The litigant property owner filed a petition for viewers, averring that portions of its property totally within the right-of-way lines had been formally condemned, and that adjoining portions only partially within the lines had not been acquired. Based on that averment, the owner asserted that a de facto taking had been effected as to the latter portions of the property, which was vacant land that had been plotted for building lots. The Commonwealth stipulated that it intended to acquire portions of the litigant's property as were within the right-of-way lines of the highway, and such additional parts of the litigant's property as might be needed for the project. In short, a partial condemnation of the remaining property was inevitable.

In *Securda* we observed that the inevitability of the condemnation could have deprived the owner of the beneficial use and enjoyment of its remaining property, and that such elements properly pleaded and proved would establish a de facto taking. However, in

*Securda* there was no averment or stipulation that because of the state's pre-condemnation actions the owner's access to its remaining property had been impeded or that the owner was unable to use the property. Nor was there any averment that the owner was threatened with the actual loss of its property because of the imminence of condemnation. Accordingly, we held that no cause of action for a de facto taking had been stated.

We also reiterated in *Securda* what we had pointed out in previous cases: that the owner was free to develop his property prior to formal condemnation and would be entitled to compensation for improvements made.

In *Commonwealth Appeal*, *Hazleton*, *Church of Jesus Christ* and *Securda*, respectively, there are two significant elements which the cases have in common: First, in each of those cases, the governmental activity upon which the claim of de facto taking was based *did not affect the owner's immediate use of the property or expose him on it to the loss of the property*. And, second, the governmental activity complained of was but a prelude to an ordained formal condemnation, which, ultimately, would compensate the owner for the property. That compensation would account for any diminution of value caused by pre-condemnation activity, and would include the value of any improvements made prior to the formal taking.

As observed above, *Commonwealth Appeal* and the other mentioned cases did not involve circumstances in which the government's pre-condemnation activity had interfered with an owner's use of his property, or exposed him to the loss of it. However, in *Conroy-Prugh Glass Co. v. Commonwealth, supra*, the legal significance of such circumstances was addressed by our state Supreme Court. In *Conroy-Prugh*, it was alleged that the government's actions had not only interfered with

the owner's use of his property, but had also, by that interference, exposed him to the loss of the property prior to its actual condemnation. The Supreme Court held that such alleged circumstances, if proved, would constitute a de facto taking.

The property owner in *Conroy-Prugh* had a tenanted commercial structure. The property, however, had become a subject of inevitable condemnation by the state pursuant to a planned highway project. According to the owner, as a result of the state's extensive pre-condemnation publicity about the highway plans, the property began to lose tenants at an accelerated rate. Within a five year period the loss of tenants was such that the rental income from the property could not meet taxes and operating expenses. Because of the nonpayment of taxes, the property was scheduled for tax sale.

In terms of legal theory, the de facto claim in *Conroy-Prugh* can be stated as follows: that the state's pre-condemnation actions had so severly diminished the rentability of the claimant's property, had so severely diminished the property's capacity to generate income, the claimant stood to lose its property *prior to formal condemnation*.

In holding that the owner's allegations in *Conroy-Prugh* were sufficient to state a claim of de facto taking, the Supreme Court emphasized that the owner was not merely one whose property suffered a decline in value due to the imminence of condemnation. Instead, as the Court further emphasized, the owner could not use its property and stood to lose it because of the imminence of condemnation. In speaking of the claimant's right to the appointment of viewers, the Supreme Court stated:

> To hold that a property owner in such circumstances has no such remedy would be to deprive that property owner of his property without due process of law.

In our view, §502(e) of the Eminent Domain Code was intended to cover just such a condition as occurred here.

*Conroy-Prugh*, 456 Pa. at 393, 321 A.2d at 602.

Derived from the holding on *Conroy-Prugh* is our decision in *Peter Roberts Enterprises, Inc. v. Department of Transportation*, 31 Pa. Commonwealth Ct. 479, 376 A.2d 1028 (1977). In *Peter Roberts*, as in *Conroy-Prugh*, the owner of realty affected by a planned state highway faced the total loss of his property in advance of any actual condemnation, because of the impact of the highway plans. We held that a de facto taking had occurred.

In *Peter Roberts* the owner had, in 1968, purchased a thirty-one acre tract of unimproved land. The owner was in the land development business, and intended to develop the tract by erecting thereon apartments or single family dwellings. A year prior to the purchase, the state had formulated its preliminary plans for the highway in question. When the owner sought to obtain building permits for the tract, local authorities advised that the tract could not be developed in its entirety: because the state highway as planned would bisect the property. Indeed, it then appeared that the highway would leave the northern fifteen acres of the tract landlocked; consequently, no building permit was then obtainable for that part because of contemplated access problems. In 1971 the owner sold the southern part of its tract, allegedly being forced to do so to mitigate financial losses occasioned by the imminence of condemnation.

After the owner, in *Peter Roberts*, had sold part of the tract, it became clear that the highway project would be delayed for several years because of funding problems. Furthermore, subsequent revision of the state's highway plans indicated that access to the owner's remaining fifteen acres could, and would, be preserved upon completion of the highway project.

However, that remaining fifteen acre parcel was subject to a mortgage. Because of the access issue initially created by the state's highway plans, the owner had been denied a building permit for those fifteen acres. Because of the owner's initial inability to obtain a building permit for that land, the land could not be used to generate the financial means to satisfy the mortgage by the time the mortgage became due in full. As a result, the foreclosure of the mortgage became imminent; and the owner faced the total loss of its property to the mortgagee before any relief would become available pursuant to a formal condemnation. Upon those facts we concluded, in the *Peter Roberts* case, that a de facto taking had occurred. Central to our decision were two elements: (1) that governmental plans for a public improvement had directly interfered with or interrupted the owner's right to develop its property; and (2), although that interference was perhaps only temporary, it nonetheless subjected the owner to the loss of the property through mortgage foreclosure.

An ascertainable legal pattern emerges when *Conroy-Prugh* and *Peter Roberts*, on the one hand, are compared with *Commonwealth Appeal* and its decisional progeny. That pattern, translated into a working principle, may be stated thus: Where a property is designated for formal condemnation pursuant to a planned, prospective public improvement, adverse interim consequences caused to the property by the prospect of condemnation will not constitute a de facto taking unless those interim consequences are that the owner is deprived of the use and enjoyment of the property, or is subjected to the loss of the property before formal condemnation can provide compensation. If there has been such an interim deprivation of use, or exposure to loss, then the principle of de facto taking becomes applicable to accelerate the time when the governmental authority must make compensation.

Although *Conroy-Prugh* and *Peter Roberts* spoke of the "imminence of condemnation," the truth remains that the imminence of condemnation in each of those cases was but the result of a planned governmental project. That is, insofar as the properties in those cases were concerned, the "imminence of condemnation" was itself a threshold consequence arising from the planned physical nature and compass of the prospective project. Thus, if the loss of tenants in *Conroy-Prugh* was imputable to a known "imminence of condemnation," it would be equally logical to impute the loss of tenants to the planned highway project itself and the tenants' awareness of it. What caused the owner in *Conroy-Prugh* to lose tenants was the tenants' knowledge that the state's highway plans would eliminate the site of their rented quarters. What caused the owner's structure to lose its commercial viability was the awareness of the prospective direct physical impact, of the state's executed plan, to the property itself.

In the *Peter Roberts* case, the adversity suffered by the landowner was the denial or impairment of the opportunity to develop its land and make the property financially viable. In that case the state's highway plans initially gave the impression that the owner's property would be landlocked by the highway project. Thus, it can be said that what impaired the owner's ability to develop the property according to the intended use, was the then foreseen direct physical impact, to that property, which would result from the prospective highway.

To approach the issue of de facto taking in terms of project impact, as distinguished from condemnation "imminence," is unnecessary where the property in question has actually been designated for formal condemnation. Yet, that conceptual distinction does become significant when the utility or economic

viability of a property has been critically impaired because of the prospective physical impact of a governmental project that does *not* contemplate formal condemnation of that particular property. For, if the planned project or improvement is authored by a municipal corporation, Article X, Section 4,[3] of our state constitution requires compensation when property is "taken, injured or destroyed" pursuant to such a project.

Article X, Section 4, of the Pennsylvania Constitution provides in pertinent part as follows:

> Municipal and other corporations invested with the privilege of taking private property for public use shall make just compensation for property *taken, injured or destroyed* by the construction or enlargement of their works, highways or improvements.... (Emphasis added.)[4]

As emphasized, this constitutional provision sets forth three express bases upon which a municipality incurs

---

[3] Pa. Const. art. X, §4. This provision replaced Article XVI, Section 8, of the state Constitution of 1874, which contained essentially the same terms. *See, e.g., Hastings Appeal*, 374 Pa. 120, 97 A.2d 11 (1953). The requirement of Article X, Section 4, that compensation be paid for property *injured* or *destroyed*, as well as for property *taken*, was incorporated into Section 601 of the Eminent Domain Code, 26 P.S. §1-601. *See* Comment of Joint State Government Commission relative to Section 601 of the Code.

[4] Article I, Secton 10, of the Pennsylvania Constitution provides in pertinent part as follows: "[N]or shall private property be taken or applied to public use ... without just compensation being first made or secured." Pa. Const. art. I, §10. However, this constitutional provision imposes no liability for consequential damages, that is, damages not caused by an actual taking. *Moyer v. Commonwealth*, 183 Pa. Superior Ct. 333, 336, 132 A.2d 902, 904 (1957). Constitutional liability for consequential damages is imposed by Article X, Section 4 (formerly Article XVI, Section 8), which is restricted to municipal and other corporations having the power of eminent domain.

liability for "just compensation" pursuant to the construction of a public project. Such liability is not limited to where a property is *actually* taken, by formal condemnation or physical appropriation; rather, liability also arises if a property is "injured" or "destroyed" by the construction of the project. In applying the above constitutional provision, our state Supreme Court has held that there need not be an actual, physical taking, but that *any destruction, restriction or interruption of the common and necessary use and enjoyment of property in a lawful manner may constitute a taking* for which compensation must be made to the owner of the property. *Miller v. Beaver Falls*, 368 Pa. 189, 82 A.2d 34 (1951); *Philadelphia Appeal*, 364 Pa. 71, 70 A.2d 847 (1950); *Caplan's Appeal*, 293 Pa. 483, 143 A. 134 (1928). Given that principle, the terms "injured" and "destroyed" contained in Article X, Section 4, become a reference to some property right other than the owner's right of indisturbed physical possession. That is, the terms "injured" and "destroyed" expand the scope of municipal liability to include destruction, restriction or interruption of a property owner's right of beneficial use, even where there is no disturbance of physical possession.

As observed, a planned project subjecting a property to an imminence of actual, physical taking can, when publicized, generate interim consequences that result in a de facto taking in a constitutional sense. However, as has also been observed, for a municipal corporation an actual taking is only one of three events or occurrences which create liability under Article X, Section 4, of our state constitution. Therefore, if the *imminence*, or *prospect*, of one of those constitutional occurrences, *i.e.*, an actual taking, can cause a de facto taking under certain circumstances, then the *imminence*, or *prospect*, of one of the other two constitutional occurrences, *i.e.*, injury or destruction of

beneficial use, can also result in an interim de facto taking, under like circumstances.

It is readily conceivable that the very prospect of the construction process that will accompany the execution of a planned municipal project could cause a building to lose tenants, obstruct the development of property, or otherwise impair the utility and economic viability of a property, even though the property has not been targeted for actual taking. That a property is not faced with any degree of actual, physical taking does not obviate the need to consider, as to that specific property, the impact of a planned and publicized project. *See Reingold v. Urban Redevelopment Authority of Pittsburgh*, 20 Pa. Commonwealth Ct. 266, 341 A.2d 915 (1975).

The above is not to suggest that the mere formulation or existence of a project plan which will affect a given property constitutes a de facto taking of the property; nor does mere publicity of the plan, without more, have that effect. Such is made clear by the decisions in *Commonwealth Appeal*, *Hazleton*, and *Church of Jesus Christ*.

However, the teaching of the *Conroy-Prugh* and *Peter Roberts* cases is that governmental publicity combined with other factors can amount to a de facto taking of property. Those circumstances were: that, pursuant to the prospective actual execution of the planned project, the property owner's total interest would be extinguished, or he would be deprived of the beneficial use of the property because of a substantial impairment of some significant appurtenant right; and, because of advance governmental publicity about the project plan and its prospective consequences, the existent utility and financial viability of the property was diminished to a degree that the owner faced the loss of the property before any execution of the project plan.

We can ascertain no sound basis for ignoring the above rationale in the case of a planned and prospective municipal project, even though the project does not contemplate the actual condemnation of a property in question. That is: if the prospective actual execution of the project will deprive a property owner of the beneficial use of his property by the substantial impairment of some significant appurtenant right; and, as a result of advance municipal publicity about the project plan and its consequences the property loses its existent utility and financial viability to the point of subjecting the owner to losing his property, then a de facto taking must be deemed to have occurred.

Before addressing the merits of the case at bar, we must reiterate what has already been pointed out in this opinion. In all cases involving a claim of de facto taking, the claimant has a heavy burden of proof; and that proof must include a showing that the deprivation complained of is the direct and necessary consequence of the governmental action in question. *E.g., Greger v. Canton Township, supra.*

## Conclusion

In rejecting the Partnership's claim of a de facto taking the lower court advanced several bases for its decision. For example, the lower court emphasized that there was never any intention on the part of the City to condemn the Essex Hotel; that is, there was no inevitability of actual taking. The lower court also concluded that the members of the Partnership knew or should have known of the prospect of the Tunnel when they purchased the hotel. Indeed, the court declared its skepticism of the motives underlying the purchase of the property. As an additional matter, the lower court determined that the Partnership's financial difficulties were caused by miscalculation and

mismanagement of the hotel venture; moreover, the court was of the view that the members of the Partnership had the personal means of paying the defaulted mortgage on the Essex and avoiding foreclosure. We agree with the appellant, that none of the above determinations or conclusions by the court necessarily preclude a de facto taking.

Yet, an important element in the lower court's decision was the determination that the Partnership had not met its proof burden of showing that the alleged detriment, underlying the claim of de facto taking, was the direct and necessary consequence of the Tunnel project and its concomitants.

Reduced to other terms, the critical ingredient in the Partnership's claim is the supposition that because of the construction activity that would take place in the street in front of the hotel, prospective patrons would, to a significant extent, reject the Essex as a place to stay. From that supposition, or premise, the Partnership asserted further that the impact of the Tunnel construction activity on would-be patrons rendered the Essex venture an unsuitable investment for new lenders, and thus deprived the Partnership of the ability to refinance its outstanding mortgage and complete the hotel improvements.

True, the Partnership presented an expert witness who gave an opinion that the Essex, even had it been an operating hotel, could not endure four years of the kind of construction work that was to take place in front of the hotel. This same witness gave the further opinion that the hotel would have been successful but for the advent of the Tunnel work. It is true, also, that the Partnership's financial witnesses testified that the reason for the denial of new financing by the insurance company and the bank, was the opinion of those two institutions that the Tunnel work would make the Essex financially unviable as a hotel operation.

However, the weight and credibility of the Partnership's testimonial evidence, concerning the impact of the Tunnel work on the prospective or hoped-for patrons of the hotel, was for the determination of the lower court sitting as the finder of fact. *E.g., In Re Condemnation by County of Allegheny*, 63 Pa. Commonwealth Ct. 99, 437 A.2d 795 (1981). The court below was not required to credit that testimony, even though there was no rebuttal by other testimony. The lower court rejected as being doubtful, speculative and conjectural the Partnership's premise that the Tunnel construction activity would deprive the Essex of the trade it would need to survive even if the hotel were able to open its doors for business during the progress of the Tunnel work. With that determination we agree.

The essence of the Partnership's claim in this case is a theory that the Essex Hotel and the business planned to be conducted there lost their present value as collateral because the Tunnel work would drive away patrons to a critical extent. Assuming, without deciding, that the "pledgability" of the property is an incident of ownership, the applicability of the Partnership's theory would depend upon making a conjectural supposition about future patronage. Private financial institutions may base their decisions on such projections or suppositions; courts may not.

This is not a case in which the property in question has been subjected to some new servitude, as in *Griggs v. Allegheny County*. There has been no legal prohibition against the physical development of the property, as in the *Peter Roberts* case. Nor is this a case in which the prospect of a governmental project has destroyed a property's existing and demonstrated income capacity, as in *Conroy-Prugh*. Although it may be said that the quality of access to the Essex Hotel will be changed during the four years of Tunnel con-

struction activity, there will be no deprivation of access.[5] The case at bar is one in which the claim of de facto taking is linked to an alleged injury that is not only prospective but is also speculative and conjectural. For such circumstances our law of eminent domain does not, in its present posture, provide relief. *Rawls v. Central Bucks Joint School Building Authority*, 8 Pa. Commonwealth Ct. 491, 498, 303 A.2d 863, 866 (1973).

For the reasons set forth, the order dismissing the petition for the appointment of viewers is affirmed.

ORDER

AND NOW, the 22nd day of February, 1982, the order of the Court of Common Pleas of Philadelphia County, dated January 9, 1980, at No. 1357 of February Term 1978, dismissing the petition for the appointment of viewers under the Eminent Domain Code, is affirmed.

Judges WILKINSON, JR. and PALLADINO did not participate in the decision in this case.

---

[5] The case law in force prior to the Eminent Domain Code denied liability for damages caused by the *temporary* deprivation of access during the construction of a public improvement, even where a municipality was involved. *E.g., Cox v. City of Philadelphia*, 107 Pa. Superior Ct. 455, 164 A. 95 (1933). That rule has not been changed by Section 612 of the Code, which is concerned with *permanent* interference with access. *See Truck Terminal Realty Co. v. Department of Transportation*, 486 Pa. 16, 403 A.2d 986 (1979).