## Standard Investments Corp. v. Commonwealth

*Charles K. Serine,* for plaintiff.
*Scott M. Olin,* Assistant Counsel, Commonwealth
of Pennsylvania, Dept. of Transportation.

SAYLOR, *J.*, June 23, 1982 — Plaintiff has come before us with an amended petition for the appointment of viewers. After an evidentiary hearing we make the following determination.

## FACTS

Plaintiff, Standard Investment Corporation, is the owner of 4.283 acres of undeveloped land located predominantly in the Wyomissing borough of Berks County, Pa. A portion of the property lies in Spring Township, Berks County, Pa. More specifically, the property is bounded by the paper streets of Lincoln, Logan, Monroe and Morwood Avenues. The property has frontage of 1,020' on Lincoln Avenue and 1,100' on Monroe Avenue. Plaintiff has been the owner of the property since 1931.[1] The subject property has remained essentially undeveloped since that time.[2]

The instant case involves the confrontation of the subject property with a partially constructed limited access highway and its proposed extension. The highway has been variously known as the "Warren Street Corridor" or the "Warren Street By-Pass". The highway is a by-pass route around the urbanized Reading area in Berks County. The By-Pass is comprised of several legislative routes; beginning at Pricetown Road, L.R. 06113, and extending

---

1. See, Berks County Deed Book, Vol. 739, p. 193.

2. In 1931, plaintiff took title to 10 acres, more or less. In the late 1950's some portions of the property were sold leaving plaintiff with the 4.283 acres at issue here. This remaining acreage has only undergone some routine periodic caretaking (e.g., grass and weed cutting). We note also that the property had been approved as a subdivision for single family residential units since 1920 and that the two parcels sold in the 1950's were sold pursuant to the Subdivision Plan. (See Exhibit 3).

through Bern Road, L.R. 06150, to Penn Avenue, L.R. 06150 spur E, to Logan Avenue, L.R. 1075 Section 2, and continuing to Lancaster Pike, L.R. 1075 Section A01. The by-pass project apparently arose as a result of a traffic study conducted in 1948. In 1957 the by-pass was proposed as a highway project. Various public meetings and hearings were held during the 1960's. In 1968 the Berks County Planning Commission prepared a report on the status of the project and surveyed the widespread publicity which surrounded the proposed project.

In February of 1969, the Pennsylvania Department of Transportation (Penn-DOT) filed a plan in the office of the Recorder of Deeds in Berks County (Highway Plan Book 103, page 2) delineating the rights-of-way needed for the proposed highway passing through Berks County (Exhibit 15). These plans were approved by the Secretary of Highways and the Governor. The plan was prepared pursuant to §402(b)(3) of the Eminent Domain Code of 1964, 26 P.S. §1-402(b)(3) and authorized Penn-DOT to condemn rights-of-way for Legislative Routes 1075, 06150 spur E, and 06150. This plan authorized only total takings within a corridor which was known to require total acquisitions. The plan, while depicting plaintiff's property, did not identify the property as a targeted property for a total take and it did not identify the property by size or ownership. Plaintiff's property lies in the A01 Section of Legislative Route 1075. This section was authorized as a 100 percent state project in the Capital Budget Act for fiscal 1972-73 and was placed on high priority for the State's six year plan for years 1972 to 1978.

In 1972, Penn-DOT filed another plan (Exhibit 7) signed by both the Secretary of Highways and the Governor in the Berks County Courthouse (High-

way Plan Book 117, page 50) authorizing condemnation of rights-of-way with respect to, inter alia, L.R. 1075 section 2 which included two parcels of land sold off by plaintiff in 1957. On May 4, 1972, one of the parcels (the Dr. Keller property) was formally taken by Penn-DOT. While the plan depicted plaintiff's remaining property to some extent, it did not identify that property or authorize any taking with respect thereto.

In 1974 plans for L.R. 1075 section AO1 were prepared (Exhibit 16). These plans identified the subject property. A plot plan was also prepared and delivered to plaintiff at this time. The plan indicated that 2.578 acres of plaintiff's property would be required to be taken for the right-of-way. This plan, however, while signed by the Secretary of Transportation, was not signed by the Governor nor was it filed in the Berks County Courthouse. In this disposition the plan apparently constituted authority only to begin appraisals and amicable acquisitions of the properties indicated for partial takings.[3]

In addition to the plot plan which was delivered to plaintiff, several letters were directed to plaintiff regarding the proposed taking. The letters clearly indicated that some portion of plaintiff's property would be ultimately taken but provided no clear timetables for such taking.[4] The entire project, in-

---

3. We note that in spite of the apparent limited authority of these plans several condemnations of property in the L.R. 1075 Section AO1 area did take place as well as almost thirty amicable acquisitions. (See Commonwealth's answer to plaintiff's supplemental interrogatories 14 and 15).

4. A letter dated January 6, 1975, and signed by Thomas J. Campion, the District Right-of-Way Administrator, explained that plaintiff's property had not been condemned but that an appraisal would be completed and an offer made to purchase the right-of-way. (Exhibit 8).

cluding the condemnation and acquisition of neighboring properties, generated much publicity through media announcements and coverage.[5]

Currently, the by-pass route is constructed to the property line of the plaintiff.[6] As already indicated, neighboring properties have been acquired by Penn-DOT. This includes properties to the southwest of plaintiff's property and properties to the northeast of plaintiff resulting in the sandwiching of plaintiff's property between already acquired properties. As presently constructed the highway also looms approximately 20 feet higher than plaintiff's property in grade level.

---

By a letter dated November 3, 1976 (Exhibit 9) and also signed by Thomas J. Campion plaintiff was informed that it would be necessary for Penn-DOT employees and for consultants to enter plaintiff's land in order to conduct survey and/or engineering studies pursuant to the filing of an Environmental Impact Statement. The letter emphasized that the property "has *NOT* been condemned, and you are *NOT* required to move from the premises."

In a letter dated March 16, 1976 (Exhibit 10) Mr. Campion informed plaintiff that before Penn-DOT was able to make offers to purchase the necessary easements severe financial problems arose which resulted in reductions in proposed highway construction. The letter went on to indicate that the by-pass project was still considered a high priority but that acquisition and construction would be delayed indefinitely pending the completion of the Environmental Impact Statement and rebudgeting in another Capitol Improvement Budget.

5. We note also that a staff report (Exhibit 13) of the Berks County Planning Commission dated October, 1975, and related to the current status of the Reading Area Transportation Study, Plan and Program indicated that L.R. 1075 Section AO1 was a high priority project with a design status 95% complete.

6. The highway is constructed and open from Princetown Road to Penn Avenue in the Borough of Wyomissing. The highway is constructed but unopened from Penn Avenue some 1800 feet southwest to the property line of plaintiff.

A title report procured for purposes of the evidentiary hearing (Exhibit 5) indicates that the Highway Plans of 1969 and 1972, filed in the Berks County Courthouse, appear as exceptions to plaintiff's insurable title in that portions of the subject premises are depicted on those plans "which show [the] location for Legislative Route No. 1075 Section No. 2 R/W, and may be acquired by condemnation for same.[7]

A real estate expert, testifying on behalf of the plaintiff, indicated that the subject property was prime realty with access to all utilities necessary for residential development. If developed westward from Wyomissing Borough rather than eastward from Spring Township the property would be suitable for upper bracket, single family residences in the $85,000 to $150,000 range.[8] However, according to this expert the property was presently unmarketable by virtue of the constructed highway abutting plaintiff's property and because it lay in a direct line with the proposed extension. This opinion was given even though no formal attempts had been made to market the property by its owner. It was also indicated, that as to that property remaining should the right-of-way be actually taken, it would be rendered inaccessible to Wyomissing Borough, further diminishing the possibility of its highest and best use.

---

7. It is noted that initially the title examiner overlooked the 1969 plan filed in Highway Plan Book 103, page 8. Plaintiff's counsel directed the examiner's attention to this oversight which was subsequently included in the final title report.

8. The real estate expert indicated that because of the orderly westward development of Wyomissing Borough it was prudent for an owner/developer of property in the western section of the borough to wait for the development of the borough to approach his property.

Mr. John Norman Klein, a major stockholder in SIC and its former secretary-treasurer, testified via deposition that the property remained undeveloped and unmarketed except for the portions sold off in 1957 to Dr. Keller and Clarence Ulmer. According to Mr. Klein, the property was not ripe for development until the late 1950's for a variety of reasons. Even at this time, however, rumors and talk about the possibility of the highway project were circulating. Nevertheless, demonstrative efforts to sell the property were never undertaken and building permits from either Spring Township or Wyomissing Borough were never requisitioned. Mrs. Norma Klein Mather, the current president of plaintiff corporation, testified that the subject property was offered to a major local builder, George Good, who refused to even make an offer on the property. According to her testimony the corporation considered the property as always up for sale and that this was a known fact among local realtors due to informal and business contacts with these realtors. These contacts contributed to the corporation's conclusion that the property was unmarketable due to the highway project.

A local builder, Ward Hayes, also testified on plaintiff's behalf. The builder had been involved with an immediately adjoining tract of land, a portion of which is included in L.R. 1075 §A01. His attempts to sell lots in the adjoining tract were unsuccessful because in his opinion the proposed highway project had frightened prospective buyers. Although seeing no physical reason why plaintiff's property had not been developed through the 30's, 40's, 50's or 60's, the builder was emphatic that he would have no interest in the subject property because of the highway project. Also, he perceived great buyer resistance to this property due to the

highway project based upon his experience on an adjoining tract.[9]

Plaintiff's property is not subject to any mortgage or threatened with exposure to a sheriff's sale or tax sale. As the subject property generates no income, taxes and minimal maintenance expenses are paid out of income from other sources of the corporation. In fact, the property is carried by plaintiff corporation as an operating loss each year. Plaintiff contends that the property has been for sale since the late 1950's when two parcels were sold pursuant to a subdivision plan drawn in 1920. Plaintiff maintains this position even though the property was never marketed through realtors or advertisements and has only been formally shown since the late 1950's to two builders who were not interested in the property apparently because of the proposed highway. These experiences coupled with media coverage, rumors, public discussion, contact with Penn-DOT and the actual construction of the highway to a point abutting plaintiff's property have caused plaintiff to consider its property unmarketable.

It has been stipulated by the parties that if L.R. 1075 §A01 is completed, a portion of plaintiff's property will inevitably be taken because the subject property is in direct line with the proposed highway. While no formal declaration of taking for plaintiff's property has been filed, neither has there been any notification, aside from notice of financial difficulties and delay, that Penn-DOT has changed its plans or abandoned the highway project.

---

9. The builder indicated that his opinion would not be affected by knowledge that Penn-DOT had made no offer or appraisal of the subject property in the past five years although he might be less concerned about it. Assessing the situation overall, however, the builder said the highway posed a major risk which he would not undertake as a builder or investor.

## DISCUSSION

We are asked to decide whether the evidence here before us is sufficient in law to constitute a de facto taking of plaintiff's property by defendant, Penn-DOT.

Under the Eminent Domain Code a condemnee may petition for the appointment of viewers where there has been a compensible injury suffered and no declaration of taking has been filed therefor. This situation has been characterized as a de facto taking. Greger v. Canton Township, 41 Pa. Commw. 20, 399 A.2d 138 (1979). De facto takings occur when an entity clothed with the power of eminent domain substantially deprives an owner of the use and enjoyment of his property. Conroy-Prugh Glass Co. v. Commonwealth, 456 Pa. 384, 321 A.2d 598 (1974); In Re: Petition of 1301 Filbert, 64 Pa. Commw. 605, 441 A.2d 1345 (1982). Petitioner claiming a de facto taking bears a heavy burden of proof including a showing of exceptional circumstances which have substantially deprived him of the use and enjoyment of the property, Penn-DOT v. Lawton, 50 Pa. Commw. 144, 412 A.2d 214, 216 (1980), and that the deprivation complained of is the direct and necessary consequence of the governmental action in question. In Re: Petition of 1301 Filbert, supra, 441 A.2d at 1352.

In Petition of 1301 Filbert, supra, Judge Robert Williams, Jr., provided an excellent exposition of the case law applicable to the question now before us. From the case law Judge Williams extrapolated a "working principle" when at 441 A.2d 1357 he said:

"Where a property is designated for formal condemnation pursuant to a planned, prospective public improvement, adverse interim consequences caused to the property by the prospect of condemna-

tion will not constitute a de facto taking unless those interim consequences are that the owner is deprived of the use and enjoyment of the property, or is subjected to the loss of property before formal condemnation can provide compensation. If there has been such an interim deprivation of use, or exposure to loss, then the principle of de facto taking becomes applicable to accelerate the time when the governmental authority must make compensation." Applying this working principle we will proceed to analyze the evidence before us.

It has been stipulated that if Legislative Route 1075 A01 is completed, a portion of the subject property will inevitably be taken by Penn-DOT. In the absence of any official pronouncement that Penn-DOT has abandoned the by-pass project, we must assume that the condemnation of some portion of plaintiff's property is indeed inevitable, although the timing of such condemnation is currently undetermined. Through further stipulation and evidentiary production it is established that Penn-DOT has recorded a number of highway plans for the Warren Street By-Pass in the Berks County Courthouse; that Penn-DOT has delivered plans to plaintiff specifically encompassing plaintiff's property; that those plans, however, were unrecorded and not yet approved by the Governor; that numerous public meetings were held; that appraisals of other neighboring properties and acquisition of and/or condemnation of properties to the northeast and southwest of plaintiff have been made; that these occurrences generated publicity in the media; that plaintiff had been informed that its property was to be appraised and an offer made for that portion of the property necessary for the right-of-way; that an environmental impact statement was initiated; that plaintiff was informed that Penn-DOT

agents had the authority and would enter its land to make surveys; and that the by-pass project has been completed to a point abutting plaintiff's property. Our inquiry, then, must focus on whether these factors create interim consequences to the property by the prospect of condemnation such as to deprive the owner of the use and enjoyment of the property.

A de facto taking does not occur when property is included in the planning stage of a program or project. Even the recording of the "ultimate" plans does not constitute a taking. See, Penn-DOT v. Lawton, 50 Pa. Commw. 144, 412 A.2d 214, 216 (1980). The approval and funding of renewal or redevelopment projects followed by notices to and negotiations with affected property owners and acquisition by agreement of some parcels are not in themselves sufficient to establish substantial interference with one's use and enjoyment of his property as to amount to a de facto "taking" or compensible injury within the meaning of the Eminent Domain Code. Redevelopment Authority of Hazelton v. Hudock, 2 Pa. Commw. 670, 281 A.2d 914, 917 (1971). Nor do governmental actions generating publicity, holding public hearings, posting a map of the project near a landowner's property and condemning other properties in the landowner's neighborhood constitute a de facto taking. Helms v. Chester Redevelopment Authority, 32 Pa. Commw. 377, 379 A.2d 660 (1977). The law is clear that these are not the exceptional circumstances, standing alone, which will substantially deprive an owner of the use and enjoyment of his property such as to constitute a de facto taking.

However, plaintiff argues that we must look at the totality of those governmental actions mentioned above and the resulting media attention which have proximately resulted in rendering plaintiff's property

unmarketable. Through its testimony plaintiff has demonstrated that the property obtained in 1931 did not become ripe for sale and development until the late 1950's. Economic realities dictated by the Depression and World War II were mainly responsible for this condition. In 1957, in response to apparently unsolicited offers, plaintiff was able to sell off two parcels of the property to individual buyers. Even at this time, however, there were rumors and discussions as to the By-Pass project which affected the marketability of the property. More recently a local builder declined to make an offer on the property allegedly due to the imminence of the By-Pass project. Although the property was never listed with a realtor nor advertised for sale, plaintiff claims that the property has always been for sale. Plaintiff points to informal efforts made through business and social contacts with realtors and builders. These contacts often led to discussions, prompted by the publicity surrounding the By-Pass, about the project's effect on the subject property. These contacts and discussions, among other things, led plaintiff to conclude that its property was now unmarketable. This conclusion was supported by a local real estate expert who opined that the By-Pass project has rendered the property unmarketable. Formal attempts to sell the property, he stated, were not necessary for him to intelligently reach that conclusion. Further support was found in the testimony of a local builder, Ward Hayes, who had dealt with an adjoining piece of property similarly affected by the By-Pass construction. Buyer awareness and perception of the construction project, he said, had frightened off any sales prospects. As a builder or an investor, Mr. Hayes was emphatic that the project posed too great a risk to interest him. Even a title search of the subject property would uncover the re-

corded By-Pass plans as exceptions to any policy of title insurance issued for the property. Since plaintiff's use and enjoyment of the subject property is the ability to sell the property for high-cost residential development, plaintiff argues that it has sufficiently demonstrated adverse interim consequences resulting from the governmental actions such as to substantially deprive plaintiff of its use and enjoyment of the property. We agree.

In Conroy-Prugh Glass Co. v. Commonwealth, supra, our Supreme Court held there were sufficient "significant facts" to establish a de facto taking of property by the effects of a proposed highway where it was averred that (1) the location of the proposed public improvement had become so fixed that condemnation of its property was inevitable, (2) publicity over an extended period about the imminence of that inevitable condemnation had caused the property owner to lose tenants so that the property no longer generated sufficient income to cover taxes and operating expenses; and (3) as a consequence, the property owner faced the loss of its property. Id. at 602.

In Penn-DOT v. Lawton, supra, the Commonwealth Court found a de facto taking where the landowner demonstrated a loss of rental income, withdrawn purchase offers and presented a listing realtor's opinion that the property was unmarketable all as the proximate result of the Department's activities. In addition, the Court was influenced by the fact that the landowner was unable to obtain the fair market value of the property through sale or fair rental value and consequently did not pay real estate taxes on the property subjecting the property to possible loss in a tax sale. Id. 412 A.2d at 215, 217.

In Commonwealth v. Pastuszek, 55 Pa. Commw. 138, 422 A.2d 1223 (1980), the Commonwealth Court adopted the lower court's rendition of facts adequately describing what amounted to a de facto taking:

The actions of the Commonwealth in preparing plans for the acquisition of properties in the bed of Ramp C, announcing its intentions over a period of ten years, conducting meetings with affected property owners, public officials and community leaders, acquiring property on either side of the Petitioner's property, making offers to other property owners in the immediate area, physically intruding upon the property of the Petitioner, lead this Court to find that a de facto taking of the Petitioner's property had occurred, that, in fact, the Petitioner's property had been damaged and a cloud placed upon it so as to adversely affect the Petitioner's beneficial use and enjoyment of that property. Id. at 1225.

In Re Crosstown Expressway, 3 Pa. Commw. 1, 281 A.2d 909 (1971), the Commonwealth Court found that at least some of the following allegations were sufficient to establish compensable injury:

". . . public proclamations of the proposed route; public statements of the imminence of condemnation which would probably occur on or before December 1, 1968; negotiating for and amicably acquiring properties within the proposed route; notice to tenants and owners of properties of the imminence of condemnation including tenants and prospective tenants of the petitioner's premises; appraisal activity; public annoucements that just compensation would be paid to condemnees; and the urging of the City of Philadelphia to impede private development of properties within the proposed route and to approve the project. Also specially averred is the loss of tenants by the property owner

and his inability to find new tenants by reason of these acts and activity of the Commonwealth." Id. at 910.

Defendant, Penn-DOT, correctly points out that each of these cases is factually distinguishable from the instant case. It is precisely for this reason that it is said that each de facto taking rests on its own unique factual posture. See, In re Department of Transportation, 25 Pa. Commw. 605, 362 A.2d 459 (1976). Interestingly, however, the only real distinction raised by the cases of Conroy-Prugh, supra, and Lawton, supra, is the threatened loss of property through tax or sheriff's sale. Although the subject property in the instant case, similarly, generates no income sufficient to cover taxes or operating expenses it is not subject at this time to the threat of a tax or sheriff's sale. As already pointed out, the plaintiff is in the fortunate position of having sufficient income from other sources to continue to carry this property as a loss each year while keeping those taxes current. But for these other economic resources, the subject property would very likely be threatened just as the property of Conroy-Prugh, supra, or Lawton, supra, Undoubtedly, the key factor is that the property cannot generate income sufficient to cover taxes or existing mortgages.

Under the Filbert, supra, "working principle" the actual threat of loss in a tax or sheriff's sale standing alone would be sufficient to constitute a de facto taking as long as the threat of such sale arose before the property would actually be condemned and as a result of the alleged condemnor's actions in dissipating or incapacitating the property's ability to generate income. Instantly, even though there is no actual or present threat of loss in a tax or sheriff's sale, plaintiff has demonstrated the property's inability to generate income through appropriate sale as a re-

sult of the Department's activities. But for other resources this inability to generate income would very likely result in exposure to a tax sale. This is a primary manifestation of the "interim consequences" which have deprived the owner of the use and enjoyment of its property. Certainly, over the course of the last eight to twelve years and perhaps even since 1957 when the By-Pass was first proposed as a highway project, plaintiff's property has been subject to the escalating public awareness of an increasing likelihood that the property would ultimately be condemned for the highway project. Indeed, in 1974 the Department so informed plaintiff in such manner that the only reasonable recourse was to continue to allocate existing resources towards maintaining ownership of the property until it was condemned or acquired within a period then appearing imminent. Even when a funding crisis developed, the property owner was still informed of the high priority of this construction project which now abuts its property.

Penn-DOT now comes before us and says that its timetable for continued construction is yet undetermined, indefinite and even speculative and that the plaintiff must, in light of this indefiniteness, and in order to meet its burden, do what all the evidence indicates are useless acts; that is, formally list and advertise the property for sale. Indeed, the Commonwealth would require that plaintiff demonstrate that no one would buy this property for any purpose whatsoever. On the contrary, we are convinced that the law has never required the performance of a vain act; especially, where the totality of circumstances indicate that the Department, through its words and actions over the course of a protracted period, has so evidently placed a dark cloud upon this property, the shadowy effect of

which is to substantially deprive the plaintiff of the beneficial use and enjoyment of its property. See, Pastuszek, supra, and In Re: Crosstown Expressway, supra.

The very indefiniteness of the Department's timetable must be viewed as exacerbating the harm done. In this respect the instant case bears some similarity to In Re: Philadelphia Parkway, 250 Pa. 257, 95 A.429 (1915), which has not lost its applicability as to the perception of compensable injury. See, Filbert, supra, 441 A.2d at 1353. In Philadelphia Parkway, supra, the Supreme Court held in favor of a landowner whose property was abutted by a partially constructed proposed highway the routes and dimensions of which were fixed and laid out. The court said:

"Now a word as to the situation of abutting owners whose properties are affected by the proposed improvement. The municipal arm of the city has lain upon all properties within the lines of the parkway, with such restrictions and limitations as are implied thereby, for a period of about 12 years. Now buildings cannot be erected, nor can valuable improvements be made, without risk of loss. Rental values have been depreciated and general market values seriously affected. Certainly this condition of affairs should not be permitted to continue indefinitely without redress to property owners who are injured thereby." Id., 95 A. at 431-432.

Instantly, at the very time that this property became ripe for its development, in accordance with its highest and best use, the governmental wheels of progress began to slowly turn, generating, as they did, adverse attention and other related consequences to the subject property which in an increasingly sophisticated marketplace has rendered the property unmarketable. That the property stood

undeveloped prior to 1957 is essentially irrelevant where economic realities and business accumen dictated this condition. After 1957 the best use of this property required awaiting the westward development of Wyomissing Borough so as to benefit from that development and join in it. The By-Pass project which now, from all appearances, looms ready to cut a swath through the subject property, with its publicity and actual construction has effectively destroyed the prospect that this property which it now abuts can ever be used in accordance with this highest and best use. This state of affairs cannot be permitted to continue indefinitely without appropriate redress.

## CONCLUSION

In view of the foregoing discussion we conclude that plaintiff has met its heavy burden by establishing facts sufficient for us to conclude that a de facto taking has occurred as a result of Penn-DOT's actions and the concomitant adverse publicity surrounding those actions with respect to the Warren Street By-Pass project.[10]

Plaintiff is therefore entitled to an appointment of a Board of View to determine the amount of damages to plaintiff's property by virtue of the de facto taking of the right of way through the subject property. For the purposes of calculating such damages the date of the taking is the date on which the petition is filed.[11] See, Commonwealth v. Lawton, supra, 412 A.2d at 217. Accordingly, we enter the following order:

---

10. In view of our disposition we need not reach plaintiff's remaining issue regarding the length of time for filing a formal declaration of taking.

11. The original petition was filed March 10, 1981.

312

## ORDER

June 23, 1982, after an evidentiary hearing and in consideration of the foregoing opinion, defendant's preliminary objections to the plaintiff's amended petition for the appointment of viewers are dismissed and plaintiff's petition is hereby granted. Accordingly, we hereby appoint Jonathan L. Wesner, Esq., Ralph E. Lebengood and Paul V. Hoch as a board of view to view the subject premises and in accordance with the requirements of applicable Acts of Assembly and Rules of Court assess the damages to which plaintiff is entitled.