IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Capital City Holdings, LLC | : | |
| | : | |
| v. | : | |
| | : | |
| Commonwealth of Pennsylvania, | : | |
| Department of Transportation, | : | No. 407 C.D. 2021 |
| Appellant | : | Submitted: May 6, 2022 |

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON          FILED: August 31, 2022


The Commonwealth of Pennsylvania, Department of Transportation (Department), appeals from the March 9, 2021 order of the Court of Common Pleas of Dauphin County (trial court). The trial court found the Department's action resulted in *de facto* takings under the Eminent Domain Code (Code)[1] of two properties owned by Capital City Holdings, LLC (CCH), overruled the Department's Preliminary Objections to a Petition for Appointment of Board of Viewers (Board of Viewers Petition) filed by CCH, and granted the Board of Viewers Petition. Upon review, we affirm.

---

[1] 26 Pa.C.S. §§ 101-1106.

## I.  Background

This matter involves the effect of the Department's proposed plan to widen and reconstruct the I-83 Capital Beltway surrounding Harrisburg (Beltway Project) on two commercial properties owned by CCH and located at 3570 Paxton Street, Harrisburg (Paxton Street Property), and 535 South Cameron Street, Harrisburg (Cameron Street Property).  *See* Trial Court Memorandum Opinion dated March 9, 2021 (Trial Court Opinion)[2] at 1.  The Beltway Project is a large highway improvement project originally planned in 2003 and divided into three sections that were developed simultaneously to ensure continuity and compatibility of the sections.  *See id.* at 3.  The Paxton Street Property is part of Section 2 of the Beltway Project, whereas the Cameron Street Property is part of Section 3.  *See id.*  The Department obtained funding for Sections 2 and 3 of the Beltway Project in 2016.[3] *See id.*  Once the Department obtains the requisite environmental clearances,[4] the Department will be able to begin the right-of-way acquisition process for affected properties located within the respective project Sections.  *See id.* at 3-4.  Actual construction of the Sections will not occur until the final project design has been approved, all required rights of way have been condemned, and all affected utilities have been relocated.  *See id.* at 4.

---

[2] On July 15, 2021, the trial court issued an opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a) that adopted the previously filed Trial Court Opinion as its Pa.R.A.P. 1925(a) opinion.  *See* Trial Court Pa.R.A.P. 1925(a) Opinion dated July 15, 2021.

[3] The Department obtained funding for Section 1 in 2006 and began construction thereon in 2016.  *See* Trial Court Opinion at 3.

[4] Each section of the Beltway Project requires an environmental clearance of some kind, be it a Categorical Exclusion, an Environmental Assessment, or an Environmental Impact Statement.  *See* Trial Court Opinion at 3.  The Department received a Categorical Exclusion for Section 3 and an Environmental Assessment for Section 2 in October of 2019 and June of 2020, respectively.

As part of the environmental approval process, the Department held a public open house regarding Beltway Project Sections 2 and 3 on October 18, 2018 (October 2018 Open House), to share the Department's intended designs for Sections 2 and 3 with the public and obtain public feedback.[5]  *See* Trial Court Opinion at 4.  While not detailed enough to indicate the full impact of the Department's proposal, aerial map diagrams of proposed Sections 2 and 3 shown at the October 2018 Open House did indicate that the new highway would be placed directly on the Paxton Street Property, and that the front of the Cameron Street Property would also be affected.[6]  *See id.* at 4-5.  At the time of the October 2018 Open House, the Department projected construction on Beltway Project Sections 2 and 3 to begin approximately five years later, or sometime around 2022 or 2023, with required private property condemnations scheduled to commence one and a half to two years before the start of construction.  *See id.* at 5.  When finally approved by the Department in November 2019, the plans for Sections 2 and 3 of the Beltway Project remained relatively unchanged from those produced at the October 2018 Open House.  *See id.*

Ted Keleman is an auto broker[7] and owner of CCH.  *See* Trial Court Opinion at 6.  Beginning in 2007, Keleman operated an automobile retail venture called Manheim Car King (Manheim) out of the two CCH properties in question.  *See id.*  Manheim rented and used the Paxton Street Property as its retail showroom

---

[5] The Department conducted a second public open house on November 19, 2019.  *See* Trial Court Opinion at 5.

[6] These diagrams ultimately became part of the environmental reports finalized thereafter.  *See* Trial Court Opinion at 5.

[7] Auto brokers buy traded-in vehicles from new car dealerships for resale to third parties through auctions and other platforms.  *See* Trial Court Opinion at 6.

3

and the Cameron Street Property as a repair and service center intended to support the retail side of the venture. *See id.* However, near the end of 2017, and prior to the October 2018 Open House, Keleman decided to shutter the Manheim operations at both the Paxton Street Property and the Cameron Street Property.[8] *See id.*

Thereafter, Keleman listed both properties for lease. *See* Trial Court Opinion at 6. Specifically, on November 27, 2017, Keleman signed a real estate listing agreement that authorized a listing of the Paxton Street Property for lease at $4,000 per month, triple net.[9] *See id.* at 7. This listing agreement was amended on April 12, 2018, to authorize the sale of the Paxton Street Property for $750,000. *See id.* CCH thereafter received two offers to purchase the Paxton Street Property for $775,000. *See id.* The first offer came from Bay, LLC (Bay), an outfit that intended to utilize the Paxton Street Property as a marijuana dispensary, and was contingent on Bay receiving a marijuana dispensary permit from the Commonwealth. *See id.* The second offer came from Rhada, Inc. (Rhada), a Dunkin Donuts franchisee that intended to open a Dunkin Donuts location at the site. *See id.*

CCH ultimately accepted Bay's offer to purchase the Paxton Street Property, keeping Rhada's offer in reserve in case the Bay deal fell through. *See* Trial Court Opinion at 8. On November 7, 2018, the Bay offer did fall through for reasons unrelated to the potential condemnation of the Paxton Street Property as a result of the Beltway Project. *See id.* Thereafter, on January 10, 2019, Rhada's consultant contacted CCH's real estate agent to inquire whether the Paxton Street

---

[8] Keleman's decision to shutter Manheim's operations was in response to learning of employee theft, not in response to the Beltway Project. *See* Trial Court Opinion at 6.

[9] "Triple net" refers to a real estate leasing arrangement whereby the leasing tenant is responsible for all taxes, insurance, and common area maintenance costs associated with a property in addition to the monthly lease amount. *See* Trial Court Opinion at 7 n.6.

Property was still available for purchase. *See id.* The October 2018 Open House having occurred, CCH's real estate agent disclosed to Rhada's consultant the possibility of the condemnation of the entire Paxton Street Property within three to four years.[10] *See id.* Rhada did not submit another offer to purchase the Paxton Street Property. *See id.* CCH did thereafter receive an offer to lease the Paxton Street Property at a rate of $4,000 per month to a fireworks retailer, but the deal was not consummated based on concerns over the potential condemnation of the property. *See id.* CCH received no further comparable offers to purchase or lease the Paxton Street Property. *See id.* at 9.

Regarding the Cameron Street Property, Keleman listed this property for lease on December 4, 2017, and thereafter amended the listing to authorize the property to be offered for sale at $399,000. *See* Trial Court Opinion at 6-7. On August 16, 2018, WR Acquisitions, LLC (WRA), a laundromat operator, offered to purchase the Cameron Street Property for $375,000, and the parties entered into an agreement of sale on October 31, 2018. *See id.* at 9. While neither CCH nor WRA knew of the potential condemnation of a portion of the Cameron Street Property at the time of the agreement of sale, the fact was discovered during the sales contract's due diligence period. *See id.* WRA ultimately terminated the sales contract based on concerns regarding the effect such a condemnation would have on needed parking at the Cameron Street Property. *See id.*

After the termination of the sale agreement with WRA, CCH received no comparable offer for purchase or lease of the Cameron Street Property. *See* Trial Court Opinion at 9. Eventually, CCH leased the Cameron Street Property at $1,500

---

[10] In fact, CCH's real estate agent began disclosing the fact of the potential condemnation to all potential purchasers of the Paxton Street Property following the October 2018 Open House, as required by the National Association of Realtors. *See* Trial Court Opinion at 8.

5

per month, which rate was below the market value of the property, but which Keleman accepted in an effort to cover the property's carrying costs. *See id.* at 9-10.

As a result of the inability to either sell or lease the Paxton Street Property or the Cameron Street Property at sufficient amounts or rates, the properties have lost money. *See* Trial Court Opinion at 10. CCH had to utilize money from other businesses owned by Keleman to cover the loans, utilities, taxes, and insurance on both properties, which expenses the properties continue to incur. *See id.* Additionally, Keleman's inability to cover the loan payment on the Paxton Street Property caused the lender, First National Bank, to call due the entire balance of this and two other loans it held on two of Keleman's other real estate holding companies, despite Keleman having missed no payments on those other loans. *See id.* To cover the loans, First National Bank confiscated Keleman's bank account. *See id.* Ultimately, Keleman was forced to take money from a retirement account and a savings account to cover the remaining loan balances.[11] *See id.* Had Keleman not covered these loans, First National Bank would have foreclosed on all his properties. *See id.*

CCH filed the Petition on January 24, 2020, alleging a *de facto* taking of both the Paxton Street Property and the Cameron Street Property and seeking the appointment of a board of viewers to evaluate the value of the properties. *See* Trial Court Opinion at 10; *see also* Petition. The Department filed the Preliminary Objections, alleging that (1) the mere publication of information about the Beltway

---

[11] The amount owed on the three separate loans totaled $496,446.12. *See* Trial Court Opinion at 10. First National Bank confiscated $340,917.73 from Keleman's personal bank account to cover the balance. *See id.* As discussed *supra*, Keleman used a retirement account and a savings account to cover the remaining balance. *See id.*

6

Project over a short period of time is not an exceptional circumstance that substantially deprived CCH of the beneficial use and enjoyment of its properties; (2) the economic hardships CCH allegedly has suffered are not the consequence of the Department's exercise of its power of eminent domain; (3) the location of the proposed Beltway Project is not fixed such that condemnation of the Paxton Street Property and the Cameron Street Property is inevitable; (4) the Petition failed to specify whether the alleged *de facto* taking is a total or partial taking of either property; and (5) the Petition fails to sufficiently describe, as required by law, the properties allegedly condemned. *See* Trial Court Opinion at 10-11; *see also* Preliminary Objections. Following a hearing and argument, the trial court determined that the Department's actions resulted in *de facto* takings of both the Paxton Street Property and the Cameron Street Property in their entirety as of the October 2018 Open House and granted CCH's request to appoint a board of viewers to assess the value of the properties at that time.[12] This appeal followed.[13]

## II. Issues

On appeal, the Department argues that the trial court erred by overruling the Preliminary Objections and granting the Petition. *See* Department Br. at 5-6 & 27-54. First, the Department argues that the trial court erred by holding that the Cameron Street Property was the subject of a *de facto* taking. *See id.* at 27-

---

[12] The trial court indicated that it would appoint a board of viewers in a separate order. *See* Trial Court Opinion at Order.

[13] "This Court's scope of review of a trial court's ruling on preliminary objections to a petition for appointment of [a board of] viewers is limited to determining whether there is competent evidence in the record to support the necessary findings and whether the trial court committed an error of law." *Ristvey v. Dep't of Transp.*, 52 A.3d 425, 429 n.3 (Pa. Cmwlth. 2012).

7

39. Specifically, the Department claims that CCH failed to prove exceptional circumstances stemming from the immediate, necessary, and unavoidable consequences of the potential condemnation existed that substantially deprived CCH of the use and enjoyment of the Cameron Street Property. *See id.* at 29-33. Additionally, the Department claims that CCH has not been deprived of the use of the Cameron Street Property, and that CCH has a remedy under the Code even if impacted by the imminence of a condemnation. *See id.* at 34-39. Second, the Department argues alternatively that, even if a *de facto* taking occurred in relation to the Cameron Street Property, the trial court erred by holding that the entire property was subject to the taking when the Beltway Project required the condemnation of only a portion of the Cameron Street Property. *See id.* at 39-42. Third, the Department claims that the trial court erred by holding that the Paxton Street Property was subject to a *de facto* taking. *See id.* at 42- 52. As with the Cameron Street Property, the Department argues that CCH failed to prove the existence of exceptional circumstances stemming from the immediate, necessary, and unavoidable consequence of the potential condemnation that deprived it of the beneficial use and enjoyment of the Paxton Street Property. *See id.* Fourth, the Department argues that, if the *de facto* takings are upheld, the trial court erred by determining that the takings occurred as of the October 2018 Open House. *See id.* at 52-53. In its fifth and final claim, the Department argues that the trial court erred by finding a damage value for the taking of the Paxton Street Property, as such a finding will prejudice any future board of viewers proceedings or determinations. *See id.* at 54.

### III.  Discussion

Section 502(c) of the Code allows a property owner that asserts that its property interest has been condemned without the filing of a declaration of taking to file a petition for the appointment of [a board of] viewers setting forth the factual basis of the petition.  *See* 26 Pa.C.S. § 502(c)(1).  "[T]he Code provides the *exclusive* method and practice governing eminent domain proceedings, including *de facto* takings, and [] preliminary objections are the exclusive method of raising objections to a petition for appointment of viewers alleging a *de facto* taking."  *York Rd. Realty Co., L.P. v. Cheltenham Twp.*, 136 A.3d 1047, 1050 (Pa. Cmwlth. 2016) (quoting *Gerg v. Twp. of Fox*, 107 A.3d 849, 852 (Pa. Cmwlth. 2015)) (emphasis in original) (brackets omitted); *see also Pileggi v. Newton Twp.*, 245 A.3d 377 n.4 (Pa. Cmwlth. 2021) ("Preliminary objections are the exclusive method under the [] Code of raising legal and factual objections to a petition for appointment of viewers which alleges a *de facto* taking." (quoting *German v. City of Phila.*, 683 A.2d 323, 325 n.5 (Pa. Cmwlth. 1996)); Section 502 of the Code, 26 Pa.C.S. § 502.  However,

> [i]n eminent domain proceedings, preliminary objections serve a broader purpose than ordinary preliminary objections and are intended as a procedure to expeditiously resolve threshold legal issues[.]  Indeed, the trial court must first determine whether a *de facto* taking has occurred before sending the matter to a board of view[ers] to determine damages.

*Hill v. City of Bethlehem*, 909 A.2d 439, 442 n.8 (Pa. Cmwlth. 2006) (internal citations omitted).  Therefore, when preliminary objections are filed in a *de facto* taking case,

9

> [a] trial court must determine first whether, as a matter of law, the averments of the petition for the appointment of [a board of] viewers, taken as true, in addition to any stipulated facts, are sufficient to state a cause of action for a *de facto* taking. If not, the preliminary objections must be sustained and the petition dismissed or allowed to be amended.

*Hill*, 909 A.2d at 443 (quoting *Stein v. City of Phila.*, 557 A.2d 1137, 1140 (Pa. Cmwlth. 1989)).

> The decision of whether a compensable taking has occurred requires an initial determination that the act complained of was, in fact, an exercise of eminent domain power. Acts not done in the exercise of the right of eminent domain and not the immediate, necessary or unavoidable consequences of such exercise cannot be the basis of a proceeding in eminent domain.

*German*, 683 A.2d at 326-27.

"A *de facto* taking is not a physical seizure of property; rather, it is an interference with one of the rights of ownership that substantially deprives the owner of the beneficial use of his property."[14]  *York*, 136 A.3d at 1050-51 (quoting *In re Borough of Blakely*, 25 A.3d 458, 463-64 (Pa. Cmwlth. 2011)) (emphasis omitted). The law is well settled that

> [i]n order to prove a *de facto* taking, the property owner must establish exceptional circumstances that substantially deprived him of the beneficial use and enjoyment of his property. This deprivation must be caused by the actions of an entity with eminent domain powers.  Also, the damages sustained must be an

---

[14] "The beneficial use of the property includes not only its present use, but all potential uses, including its highest and best use." *York*, 136 A.3d at 1051.

10

> immediate, necessary and unavoidable consequence of the exercise on the entity's eminent domain powers.

*Id.* at 1050-51 (quoting *Blakely*, 25 A.3d at 463-64) (emphasis and footnote omitted). Thus,

> [a] property owner carries a heavy burden of proof in *de facto* condemnation proceedings and must show that: (1) the condemnor has the power to condemn the land under eminent domain procedures; (2) [] exceptional circumstances have substantially deprived him of the use and enjoyment of his property; and (3) the damages sustained were the immediate, necessary, and unavoidable consequences of the exercise of the eminent domain power.

*In Re Mountaintop Area Joint Sanitary Auth.*, 166 A.3d 553, 561 (Pa. Cmwlth. 2017); *see also York*, 136 A.3d at 1050-51. No bright line test exists to determine whether a government action has resulted in a *de facto* taking; each case presents a fact-specific inquiry. *See York*, 136 A.3d at 1050-51. "[W]hen determining whether a *de facto* taking has occurred, we focus on the governmental action in question." *Mountaintop Area Joint Sanitary Auth.*, 166 A.3d at 561.

Pennsylvania courts have explained that certain specific actions do not, individually, "substantially deprive an owner of the use and enjoyment of his property such as to constitute a *de facto* taking." *Standard Invs. Corp. v. Com.*, 28 Pa. D. & C. 3d 294, 304 (C.P. Pa. 1982), *aff'd sub nom. Dep't of Transp. v. Standard Invs. Corp.*, 472 A.2d 282 (Pa. Cmwlth.),[15] *aff'd*, 485 A.2d 392 (Pa. 1984). Such actions include: (1) the inclusion of a property in the planning stage of a program

---

[15] In *Standard Investments*, this Court affirmed based on the opinion of the Court of Common Pleas of Bucks County, the holdings of which we expressly affirmed. *See Dep't of Transp. v. Standard Invs. Corp.*, 472 A.2d 282, 282 (Pa. Cmwlth.), *aff'd*, 485 A.2d 392 (Pa. 1984).

11

or project; (2) the recording of a plan or project's "ultimate" plans; (3) approval and/or funding of renewal or redevelopment projects; (4) notices to and/or negotiations with affected property owners; (5) acquisition of properties by agreement; (6) governmental actions generating publicity regarding a program or project; (7) holding public hearings on a program or project; (8) posting maps of the program or project near a landowner's property; and (9) condemning other properties in a landowner's neighborhood. *See id.* at 304. However, these actions and other factors may combine in a manner such that the totality of the circumstances may render a property unmarketable and thereby substantially deprive the plaintiff of its use and enjoyment of the property. *See id.* at 305-06; *Dep't of Transp. v. Lawton*, 412 A.2d 214, 216 (Pa. Cmwlth. 1980).

Additionally, Pennsylvania courts have found that *de facto* takings implicating a right to the appointment of a board of viewers to determine appropriate compensation can occur where an impending condemnation, even if not yet finalized, impacts a property to the point where it no longer generates sufficient income to cover taxes and/or mortgages, and thus threatens loss of the property. *See Conroy-Prugh Glass Co. v. Dep't of Transp.*, 321 A.2d 598, 602 (Pa. 1974). Therefore, "[i]f there has been [] an interim deprivation of use[] or exposure to loss, then the principle of *de facto* taking becomes applicable to accelerate the time when the governmental authority must make compensation." *Standard Invs.*, 28 Pa. D. & C. 3d at 302-03.

Here, the trial court found that exceptional circumstances did exist that impacted CCH's beneficial use and enjoyment of its properties. *See* Trial Court Opinion at 15. The trial court found CCH showed that the subject properties were unable to be sold or leased at the prices at which they could have been sold or leased

12

prior to the October 2018 Open House, and that the offers received on the properties following the October 2018 Open House were significantly lower than those received before. *See id.* Thus, the trial court concluded, "the evidence shows that the marketability of the subject properties was greatly affected by the publicity of the [Beltway] Project and the [October 2018] Open House that was held to inform the public of the proposed plans for the [Beltway] Project." *Id.* Additionally, the trial court found the evidence illustrated that, following the October 2018 Open House, the properties were unable to generate sufficient income to cover tax and loan payments. *See id.* at 16. Thus, the trial court determined that CCH sustained its burden of showing exceptional circumstances necessary to justify a finding that a *de facto* taking occurred with respect to each property. *See id.*

We find no error in the trial court's determination. Pennsylvania courts have found *de facto* takings occurred under circumstances similar to the instant matter. In *Standard Investments*, the trial court found, and this Court affirmed, a *de facto* taking occurred where escalating public awareness of an increasing likelihood of condemnation rendered a property unmarketable, resulting in a failure of the property to generate adequate income to cover taxes or existing mortgages. *See Standard Invs.*, 28 Pa. D. & C. 3d at 310-11. Likewise, in *Conroy-Prugh*, our Supreme Court found a *de facto* taking occurred where a loss of tenants following public hearings on a non-finalized project resulted in insufficient income to pay taxes and threatened loss of property. *See Conroy-Prugh*, 321 A.2d at 602. Additionally, in *Lawton*, this Court found that proof of loss of rental income, unmarketability of the property, and the threat of loss at a sheriff's sale for unpaid taxes established a *de facto* taking cause of action. *Lawton*, 412 A.2d at 217.

13

Here, the evidence illustrated that, prior to the October 2018 Open House, CCH received offers of $775,000 and $375,000 to purchase the Paxton Street Property and the Cameron Street Property, respectively. The evidence further illustrated that, after the October 2018 Open House and the disclosure of the possible condemnation of the properties to prospective purchasers/lessors of the properties by CCH's real estate agent, apprehension regarding the potential condemnation of the Cameron Street Property resulted in the termination of that sales agreement. CCH did not receive any offers to purchase or lease either property for amounts approaching the offers it had received before the October 2018 Open House.[16] While CCH was able to lease the Cameron Street Property after the October 2018 Open House, the rent received was significantly below market value and was accepted only in an effort to cover the property's carrying costs. Additionally, following the October 2018 Open House, the properties' income decreased to a point where they no longer generated adequate funds to cover the loans and taxes due thereon, thus subjecting the properties to possible foreclosure/loss.[17] While any of these actions in isolation may not have warranted a finding of *de facto* taking, the totality of this evidence adequately supports the trial court's conclusion that exceptional circumstances adequate to justify a *de facto* taking existed with respect to each property. *See Standard Invs.*, 28 Pa. D. & C. 3d at 302-03 & 305-06; *see also Lawton*, 412 A.2d at 217; *Conroy-Prugh*, 321 A.2d at 602.

---

[16] We acknowledge that CCH was able to lease the Cameron Street Property after the October 2018 Open House, but note that the $1,500 monthly rent was below market value and accepted only in an effort to cover the property's carrying costs.

[17] We note that Keleman's ability to satisfy his properties' outstanding loan balances through the use of his personal funds does not alter the fact that the reduction of income from the properties placed them in danger of foreclosure in the first place. *See Standard Invs.*, 28 Pa. D & C. 3d at 308-09.

We also disagree with the Department to the extent it argues that the trial court erred by finding a *de facto* condemnation occurred regarding the entirety of the Cameron Street Property. As the trial court noted, "based on the plans as set forth by [the Department], the Cameron Street Property will essentially be landlocked with no ingress or egress." Trial Court Opinion at 18. The Department's actions also affected the entirety of the Cameron Street Property in terms of its market value. The prospective buyer cancelled the agreement to purchase the Cameron Street Property based on concerns about the effect the partial condemnation would have on the practical use of the entire property. *See Standard Invs.*, 28 Pa. D. & C. 3d at 308-09 (finding a *de facto* taking as to entire property entitling the appointment of a board of viewers where proposed taking of portion of property resulted in lost income and an inability to generate income through an appropriate sale of entire property). As discussed *supra*, the trial court properly determined that a *de facto* taking occurred with reference to the Cameron Street Property. The effect of the alleged partial condemnation on the overall market value of the Cameron Street Property is a matter for the board of viewers to determine.

Further, we find no error with the trial court's assignment of the October 18, 2018 date to the *de facto* takings at issue in this matter. The evidence illustrated that the October 2018 Open House commenced the period of decline in the income-producing and sale value of both the Paxton Street Property and the Cameron Street Property. At a minimum, the October 2018 Open House represented the point in time after which CCH's real estate agent's ethical obligation required disclosure of the potential condemnation to potential purchasers and lessors, which disclosure directly resulted in the termination of a sale agreement for the Cameron Street Property. To hold that the *de facto* taking should be dated from the Petition's

15

filing date would fail to acknowledge the diminution in the properties' value prior to the filing of the Petition, which diminution in value exposed the properties to possible loss and is the very change in value upon which CCH based its claim of *de facto* takings in the first place, and upon which the trial court based its finding that *de facto* takings had, in fact, occurred.

Finally, we are not persuaded by the Department's argument that the trial court prejudiced a future damages proceeding by stating in a footnote that the fair market value of the Paxton Street Property was $775,000 prior to the October 2018 Open House. *See* Department Br. at 54. In the footnote in question, the trial court restated the testimony of CCH's expert placing the fair market value of the Paxton Street Property at $775,000 as a function of an offer received to purchase that property before the October 2018 Open House. *See* Trial Court Opinion at 15 n.8. As the Department notes, the assessment of damages/values in matters involving *de facto* takings rests with the appointed board of viewers. *See* Department Br. at 54; *see also* 26 Pa.C.S. § 512(5). Thus, the board of viewers will not be bound by the trial court's restatement and/or assessment of the testimony given. The Department's argument that the trial court's footnote has prejudiced future proceedings lacks merit.[18]

## IV. Conclusion

For the above reasons, we affirm the trial court's March 9, 2021 order.

_____
CHRISTINE FIZZANO CANNON, Judge

---

[18] We further note that the Department retains a right to appeal from a future board of viewers' determination should it feel aggrieved thereby. *See* 26 Pa.C.S. § 516(a)(1).

16

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Capital City Holdings, LLC      :
      :
v.      :
      :
Commonwealth of Pennsylvania,      :
Department of Transportation,      :   No. 407 C.D. 2021
Appellant      :

O R D E R

AND NOW, this 31st day of August, 2022, the March 9, 2021 order of the Court of Common Pleas of Dauphin County is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge